UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEURON SPACE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BLUE CUBED, LLC,<br><br>Defendant. | Case No. 25-cv-06649-EMC<br><br>**ORDER GRANTING MR. HUSSEINI'S MOTION TO DISMISS; GRANTING IN PART AND DENYING IN PART NEURON'S MOTION TO DISMISS**<br><br>Docket No. 73, 74 |

This case is a contract and trade secret dispute between two technology start-ups in the space satellite communications industry. On December 18, 2025, the Court granted in part and denied in part Defendant Blue Cubed's motion to dismiss. Dkt. No. 61. Blue Cubed subsequently answered the amended complaint, asserting counterclaims against Plaintiff Neuron, as well as a claim against A.Z. Husseini, the director and CEO of Neuron, who was not previously a party. Dkt. No. 63. Neuron moves to partially dismiss the counterclaims. Dkt. No. 74. Mr. Husseini moves to dismiss the sole claim against himself. Dkt. No. 71.

For the reasons stated below, Mr. Husseini's motion is **GRANTED**. Neuron's motion is **GRANTED** in part and **DENIED** in part.

## I.      BACKGROUND

### A. Blue Cubed's Counterclaim Allegations

Blue Cubed is a Colorado-based start-up in the business of designing, developing, manufacturing, and marketing compact optical communications terminals (OCTs) for use in space. Dkt. No. 63, Counterclaims ¶ 10 [hereafter CC]. Blue Cubed was founded in 2018 by three

engineers. *Id.* ¶ 11-14. Neuron is a California-based start-up focused on "novel satellite telecommunication solutions in Low Earth Orbit ("LEO")." Dkt. No. 35, ¶ 12 ("FAC"). Neuron was founded in 2020 by Mr. Husseini. CC ¶ 16, 23.

IP Agreement Between Blue Cubed and Neuron

In September of 2020, Blue Cubed was contacted by Mr. Husseini. *Id.* ¶¶ 16-17. Mr. Husseini was interested in collaborating on optical communications technology. *Id.* At that time, Blue Cubed had a pending patent application for an optical transceiver. *Id.* ¶ 18. In the summer of 2021, Neuron and Blue Cubed entered into an IP licensing agreement (IP Agreement). *Id.* ¶ 19.

In the IP Agreement, Blue Cubed licensed to Neuron its provisional patent application entitled 'Single Aperture Optical Transceiver'" (now issued as U.S. Patent No. 11,258,514), related patent applications, "improvements to Blue Cubed optical communication terminals developed by Blue Cubed, LLC for 5 years," and any "know-how, any trade secrets, or other IP" necessary to use Blue Cubed's terminal. *Id.* ¶ 20. Neuron's license was exclusive as to "providing Communication-as-a-Service (CaaS) between spacecraft in low Earth Orbit (LEO), where LEO is defined as between 100 and 2000 km of Earth surface. CaaS is defined as a space-borne entity in LEO providing access to any other space- borne entity in LEO for the purpose of transporting data originating from an asset(s) in space that is owned or operated by any third party." *Id.* ¶ 19 (citing Dkt. No. 18-1 ¶ A.) The license "does not prohibit Blue Cubed, LLC from licensing the use of the Blue Cubed IP to an additional third-party licensee that is using the optical communication terminals to connect space-borne assets in LEO, wherein the space-borne assets are wholly owned by said third party licensee" and "does not prohibit Blue Cubed, LLC from licensing the use of the Blue Cubed IP to any third-party licensee that does not compete with Neuron in the CaaS market such as for Position, Navigation and Timing." Dkt. No. 18-1. Blue Cubed received as consideration for the license 1 million shares of Neuron common stock and a license back to Blue Cubed for any improvements Neuron makes to the Blue Cubed IP. CC ¶ 22.

Neuron planned to use this license for an optical bench transceiver to create a "novel architecture" "in which Neuron would host a low SWaP [optimized size, weight, and power] payload on satellites to provide real-time connectivity hardware." FAC ¶ 21. The license stated

that Blue Cubed "anticipate[d] use of the Blue Cubed IP to sell Blue Cubed optical communication terminals for use in spacecraft that are not providing CaaS in LEO as defined above," and contemplated that "Neuron [would] produce the optical communication terminals and sell the optical communication terminals at then actual production cost to Blue Cubed, LLC along with blueprints, firmware and software source code, and any testing data that is available." Dkt. No. 18-1 at 3.

Subcontractor Agreement between Neuron and Blue Cubed

In 2021, the parties collaborated on a pitch to the Department of Defense's Defense Innovation Unit to obtain government funding to develop a "novel" optical communications terminal that would provide more efficient and sensitive laser-based communications between satellites by operating at a specific wavelength (850 nm). Dkt. No. 4-4 at 27; FAC ¶ 21; CC ¶ 21. The Government entered into a prototype development agreement with Neuron. CC ¶ 25; Dkt. No. 4-4. In this agreement, the Government provided $3 million to Neuron to "to design, develop, test, and deliver three (3) prototype lasercom terminals." Dkt. No. 4-4 at 27. Neuron and Blue Cubed entered into a subcontractor agreement for the work related to the government contract. *Id.* ¶ 26. The Subcontractor Agreement provided that Blue Cubed would perform certain work as a subcontractor set forth in Statement of Work ("SOW"), and that Neuron would provide milestone payments to Blue Cubed as set forth in an attached schedule. *Id.* ¶ 28.

Neuron and Blue Cubed agreed "that any and all improvements made to Subcontractor's IP (inventions, copyrights, trade secrets, derivative works, source code and any other proprietary information, confidential information, designs, data or know how, etc.) shall remain property of Subcontractor." Dkt. No. 4-4 at 11. The only IP that Neuron would own is that "related to the optics/gimbal interface effort (inventions, copyrights, trade secrets, derivative works, source code and any other proprietary information, confidential information, designs, data or know how, etc.) developed under this Agreement." *Id.* This clause is "subject to limitations due to [Neuron's] obligations to any third party regarding the IP related to the optics/gimbal interface effort." *Id.* Blue Cubed alleges that this clause was intended to exempt third-party Hood Tech's gimbal and work. CC ¶ 29. Hood Tech is a company specializing in gimbals that was brought on the project

3

United States District Court
Northern District of California

as a subcontractor to complete the gimbal portion of the OCT. A gimbal is a device that provides mechanical stabilization. The inclusion of a gimbal in the OCT facilitates the movement and orientation of the OCT's optical components.

The Subcontractor Agreement also contained a cross license, stating "Both Parties agree that any IP generated under this Agreement shall be licensed to the other Party, subject to limitations due to Company's obligations to any third party regarding the IP related to the optics/gimbal interface effort." Dkt. No. 4-4 at 11. However, the Subcontractor Agreement further clarifies that the cross-license does not provide Neuron with "a license to use any software, copyrighted material, data, or hardware generated under this Agreement for purposes outside of the licensed use case of Communication-as-a- Service (CaaS) market."[1] *Id.*

The Subcontractor Agreement outlined deliverables that Blue Cubed was to provide to Neuron on a set timeline. *Id.* ¶ 31. One major area of dispute between the parties, that the Court previously declined to resolve at the pleading stage, is whether the three prototype units discussed in the Subcontractor Agreement – Qual Unit, Flight Unit No. 1, and Flight Unit No. 2 – were deliverables under the contract, which belong to Neuron. Blue Cubed maintains that the only deliverables contemplated by the contract were documentation, testing, and data — not the prototype itself — and that Blue Cubed retains rights and title to the prototype units it physically developed. *See* Dkt. Nos. 61, 37.

Blue Cubed alleges that it has "done the work called for by the SOW," completing all of the enumerated deliverables except for one concerning test results associated with two different flight units. *Id.* ¶ 32-33. Blue Cubed alleges that this deliverable was partially completed when it delivered test results for the first flight unit in August 8, 2025. *Id.* ¶ 33. Shortly after, Blue Cubed began to assemble the second unit. *Id.* To complete the unit, integration of a gimbal from Hood Tech was required. *Id.* Blue Cubed was scheduled to meet with Hood Tech on September 19,

---

[1] CaaS is defined as "include[ing] any data communication between space-borne entities in low Earth Orbit (LEO), where LEO is defined as between 100 and 2000 km of Earth surface. CaaS can also include a space-borne entity in LEO providing access to any other space-borne entity in LEO for the purpose of transporting data originating from an asset(s) in space that is owned or operated by any third party." Dkt. No. 4.4 at Section 9.4.

2025, but on September 18, Neuron issued a stop work order to Hood Tech. *Id.* Due to that stop work order, Hood Tech withheld the gimbal required for integration. *Id.* Blue Cubed thus alleges that due to Neuron's interference it cannot complete the final deliverable it owes to Neuron under the contract. *Id.* This deliverable required Blue Cubed to "collaborate with Hood Tech towards integrating a matured optical payload onto each of the three flight unit gimbals, producing three flight-ready lasercom terminals." Dkt. No. 4-4 at 32. The SOW further specifies that Blue Cubed would "facilitate access to qualification facilities," and a joint team from Blue Cubed and Neuron would "put each unit through thermal, vacuum and vibration testing for acceptance." *Id.* Following this, Blue Cubed was to "deliver the Flight Unit Acceptance Report, in slide format" and "deliver an updated System Architecture Document, providing institutional knowledge on how to install the lasercom terminal on a spacecraft." *Id.* (underline in original).

Space Impulse Test Flight

In late 2024, Neuron secured a test flight opportunity for Flight No. 1 with third-party Impulse Space. *Id.* ¶ 35. Impulse Space is a space transportation company with spacecrafts that can move satellite units like Flight Unit No. 1 between orbits. *Id.* Hardware delivery for this flight was planned for spring of 2025. *Id.* The Subcontractor Agreement stated that "[a] flight demonstration [] is outside the scope of this SOW." Dkt. No. 4-4 at 27. However, from the start, subcontractors Blue Cubed and Hood Tech were closely involved with the test flight preparation. Blue Cubed and Hood Tech attended the kick-off call and over the months that followed, Blue Cubed and Hood Tech were the ones to answer Impulse's technical questions. *Id.* ¶ 36. In preparation for the Impulse Space testflight, Blue Cubed and Hood Tech customized Flight Unit No. 1 in a variety of ways "including implementing a custom Ethernet interface, conducting custom vibration testing, and paying expedite fees to fabricators in order to meet the delivery timeline." *Id.* ¶ 37. Neuron did not fund these customizations. *Id.* Blue Cubed and Hood Tech worked for hundreds of hours to prepare the terminal for flight. *Id.* ¶ 37.

On April 30, 2025, Hood Tech emailed Neuron and Blue Cubed stating that some kind of "collaboration agreement" was needed because of the growing scope of the work associated with the test flight, which was not covered by existing contracts. *Id.* ¶ 38. The three companies

United States District Court
Northern District of California

discussed a separate collaboration agreement for the Impulse Flight, and Neuron sent Blue Cubed a draft agreement on May 9. *Id.* ¶ 38. Blue Cubed sent back a revised draft with language that all parties would have access to data and testing coming out of the Impulse flight. *Id.* ¶ 38. This clause reflected Blue Cubed's understanding that it was doing this additional work to receive the benefit of the test flight data. *Id.* ¶ 34. At the time, Neuron made no objection to Blue Cubed's requests for the test flight data. *Id.* ¶ 38. Blue Cubed sent Flight Unit No. 1 to Impulse to be installed on the Impulse spacecraft. *Id.* ¶ 39.

Through the rest of May, the parties exchanged more drafts on the collaboration agreement. *Id.* ¶ 40. However, after Neuron made its position clear that it owned Flight Unit No. 1, negotiations broke down. *Id.* ¶ 40. Blue Cubed continued to attend meetings in preparation for the flight, including performing multiple checks with the Impulse technicians and further technical support, including a further customization of test software. *Id.* ¶ 41- 43. Final testing took place on July 15, 2025, with Blue Cubed, Hood Tech, and Neuron representatives in attendance. *Id.* ¶ 44. Blue Cubed and Hood Tech performed the functional tests. *Id.*

On November 28, the Impulse flight launched "taking "Flight Unit No. 1 with it." *Id.* ¶ 46. Blue Cubed alleges that Neuron has to date "monopolized" communications with Impulse and "refused to share any data or test results from the flight." *Id.* ¶ 46.

<u>Neuron's Communications with Third Parties About Blue Cubed</u>

Blue Cubed entered into an agreement with a company named HawkEye 360 for the sale of OCTs. *Id.* ¶ 51. (The Court previously allowed Neuron's claim of tortious interference with prospective economic advantage to proceed based on allegations that Blue Cubed has disrupted its relationship with HawkEye. Dkt. No. 61.) HawkEye intends to install and operate these OCTs in its satellites to enable those satellites to communicate with each other. *Id.* Blue Cubed maintains that it will not operate the terminals or otherwise provide communications services; it is only selling the terminals. *Id.* Blue Cubed accordingly alleges that this use falls outside of Neuron's exclusive field of use from the IP License, which covers communications as a service. *Id.* ¶ 52.

Blue Cubed alleges upon information and belief that Mr. Husseini, speaking for Nueron, has "told HawkEye that Neuron owns the OCTs Blue Cubed is selling and that Blue Cubed does

United States District Court
Northern District of California

not have the right to sell the OCTs to HawkEye." *Id.* ¶ 53. These alleged statements occurred in March of 2025. *Id.* Blue Cubed alleges that Neuron has made similar statements about Blue Cubed's right to use the IP to members of Hood Tech and a DoD representative in September of 2025. *Id.* ¶ 54, 55.

Neuron's Fundraising

Blue Cubed alleges on information and belief that Neuron has shared with potential investors a slide deck containing detailed cross sections of the OCT developed under the Subcontractor Agreements. *Id.* ¶ 57. Blue Cubed alleges that this includes information that Blue Cubed has not shared with third parties. *Id.* ¶ 58. Blue Cubed alleges that the information disclosed contains Blue Cubed's trade secrets, including:

i) The form-factor and placement of particular components;

ii) Identity of critical internal components;

iii) Optical architecture of key system components, including the telescope;

iv) Architecture and approach for coupling photonic elements to free-space optics;

v) Details about test and manufacturing processes and infrastructure.

Blue Cubed also alleges that Neuron has made misrepresentations to these investors about the scope of its license to Blue Cubed's IP and that its contract with the DoD is complete. *Id.* ¶ 61-63.

Fiduciary Claim

Blue Cubed owns 1 million shares in Neuron common stock, approximately 10% of Neuron's common shares. *Id.* ¶ 48. This stock was received in consideration for the IP Agreement. *Id.* Blue Cubed alleges that Neuron has never held a shareholder meeting, asked Blue Cubed to vote on any corporate actions, sent out annual or other reports, or provided other information in response to Blue Cubed's requests, including valuation for the stock and capitalization tables. *Id.* ¶ 49.

United States District Court
Northern District of California

### B. Procedural History

Neuron filed this case on August 6, 2025.  Dkt. No. 1.  Neuron initially sought a TRO against Blue Cubed's disclosures of its trade secrets at a trade show, which the Court denied.  Dkt. No. 23.  After full briefing and oral argument, the Court denied Neuron's motion for a preliminary injunction.  Dkt. No. 37.  On December 18, the Court granted in part and denied in part Blue Cubed's motion to dismiss.  Dkt. No. 61.  The Court granted dismissal of Neuron's Anticipatory Breach, Lanham Act, and fraudulent inducement claims, but denied dismissal of Neuron's Breach of Contract, Trade Secret Misappropriation, Tortious Interference with Prospective Economic Advantage, and UCL claims.  *Id.*  In adjudicating the breach of contract claim, the Court reiterated that "both parties have presented plausible interpretations of the contract" and that "extrinsic evidence of the parties' respective understandings and their course of conduct may be useful in resolving the contract dispute."  *Id.*

Blue Cubed filed its answer with counterclaims on January 5, 2026.  Dkt. No. 63.  Blue Cubed alleges (1-2) Breach of Contract, (3) Breach of Implied Covenant, (4) Conversion, (5) Unjust Enrichment, (6) Trade Secret Misappropriation, (7) Intentional Interference with Contractual Relations, (8) Tortious Interference with Prospective Economic Relations, (9) Commercial Disparagement, and (10) Unfair Competition against Neuron and Breach of Fiduciary Duty against Mr. Husseini.  Neuron moved to dismiss the Breach of Implied Covenant, Conversion, Unjust Enrichment, Intentional Interference with Contractual Relations, and Commercial Disparagement claims.  Dkt. No. 74.  Mr. Husseini moved to dismiss the Breach of Fiduciary Duty claim.  Dkt. No. 73.

## II.    <u>DISCUSSION</u>

### A. Covenant of Good Faith and Fair Dealing

"There is implied in every contract a covenant by each party not to do anything which will deprive the other parties thereto of the benefits of the contract."  *Harm v. Frasher*, 181 Cal.App.2d 405, 417 (Cal. App.1960).  To state a claim for breach of the implied covenant, a party must show

United States District Court
Northern District of California

that: "(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010) (citing Judicial Council of California Civil Jury Instruction 325.) While a "breach of a specific provision of the contract is not a necessary prerequisite" to establishing a breach of the implied covenant of good faith and fair dealing, "[t]he implied covenant will not apply where no express term exists on which to hinge an implied duty." *Malcolm v. JPMorgan Chase Bank, N.A.*, No. 09-4496-JF (PVT), 2010 WL 934252, at *6 (N.D. Cal. Mar. 15, 2010). "If the allegations in a breach of implied covenant claim do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." *Id.*; *accord Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 327 (Cal. 2000) ("[W]here breach of an actual term is alleged, a separate implied covenant claim, based on the same breach is superfluous.").

In seeking dismissal, Neuron primarily argues that Blue Cubed's breach of implied covenant claim is superfluous to Blue Cubed's breach of contract claim (which Neuron does not seek to dismiss at this stage). However, the two claims appear to concern different conduct. For Blue Cubed's breach of contract claim, Blue Cubed alleges that Neuron breached the subcontractor agreement claim by Neuron's "[selling] or attempting to sell OCTs containing Blue Cubed IP for use cases outside its licensed use case" in violation of an express contractual term limiting Neuron to certain use cases. CC ¶¶ 72-73. For Blue Cubed's breach of implied covenant claim, on the other hand, Blue Cubed alleges that Neuron improperly interfered with its performance of the contract's final deliverable by issuing a stop work order to the gimbal subcontractor Hood Tech, which made completion of the final deliverable impossible. *Id.* ¶ 33, 78-81. The implied covenant claim is not based on violation of the IP licensing term, but hinges on alleged conduct by Neuron that interfered with Blue Cubed's ability to complete its final deliverable and benefit from the contract. This is distinct conduct not covered by an express

9

contractual term.  Rather, Blue Cubed's claimed violation is implied from the express terms that state deliverables for Blue Cubed, with the accompanying expectation that Neuron would not interfere with Blue Cubed's ability to complete such deliverables.  Blue Cubed has thus stated a claim for breach of implied covenant that is distinct from its contract claim.

Further, as the Court observed during oral argument, this dispute is somewhat academic. Even if the conduct Blue Cubed alleges is better encompassed by a breach of contract claim, since Neuron does not challenge its breach of contract ground, Blue Cubed states a claim either way.

Neuron's motion to dismiss the implied covenant claim is **DENIED**.

### B.  Conversion

Under California law, "conversion is the wrongful exercise of dominion over another's personal property in denial of or inconsistent with his rights in the property." *In re Emery*, 317 F.3d 1064, 1069 (9th Cir. 2003).  The elements are: "(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by wrongful act inconsistent with the property rights of the plaintiff; and (3) damages." *Id.*  With respect to the second element, although "[i]t is not necessary that there be a manual taking of the property," there must be "an assumption of control or ownership over the property." *Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1135 (2014).

Blue Cubed's conversion claim concerns Flight Unit No. 1, which Blue Cubed produced in collaboration with Hood Tech and Neuron for a test flight with Impulse Space.  The flight launched on November 28, 2025 "taking Flight Unit No. 1 with it."  CC ¶ 46.  At oral argument, Blue Cubed clarified that Flight Unit No. 1 is currently in space, in the physical possession of Impulse Space but, according to Blue Cubed, under Neuron's control.  Blue Cubed's conversion claim centers on Neuron "depriv[ing] Blue Cubed of valuable data and test results from the Impulse test flight."  *Id.* ¶ 87.

In their briefing and argument, the parties rehash one of their core disputes over whether the prototype units themselves are deliverables under the contract, or whether the contract deliverables were only documentation and data associated with the development of the prototypes.

10

Neuron argues that the prototypes were deliverables, so Flight Unit No. 1 is its property. Blue Cubed disputes this and asserts that it owns Flight Unit No. 1, which it developed. The Court has already declined to resolve this question at the pleading stage. In denying Blue Cubed's motion to dismiss Neuron's contract claims, the Court noted that, "As the Court previously found when adjudicating the motion for preliminary injunction, both parties have presented plausible interpretations of the contract. While construction of the contract will ultimately be a question for the Court, the Court anticipates that extrinsic evidence of the parties' respective understandings and their course of conduct may be useful in resolving the contract dispute." Dkt. No. 61.

More relevant to the matters at hand, the parties dispute whether Blue Cubed has any possessory right in the flight testing data. It is undisputed that no written contract gives Blue Cubed a right to such data (though Blue Cubed contends that it owns the underlying hardware unit). *See* CC ¶ 38-40 (efforts to develop "collaboration agreement" concerning test flight that ultimately "br[oke] down"); Dkt. No. 76, (Opp.) at 7 (Blue Cubed recognizing that "no 'enforceable, binding agreement exists' with respect to the data and test results"). But drawing all inferences in Blue Cubed's favor, Blue Cubed plausibly alleges an unwritten contract between the parties – either oral or implied-in-fact – that provides Blue Cubed with a right to the test flight data. *See* CC ¶ 34 (alleging Blue Cubed's understanding that all parties were to receive "valuable data and test results from the test flight"); *id.* ¶ 40 (alleging that Neuron never objected to language guaranteeing Blue Cubed access to data and testing in connection with the Impulse flight).

Blue Cubed's conversion claim also raises questions under other common law elements of conversion. Blue Cubed is not seeking return of the Flight Unit No. 1 hardware itself; rather, Blue Cubed seeks testing and data results from the unit, an intangible property interest. Intangible property may be the proper subject of a conversion claim. *See Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202, 211 (Cal. App. 2014) (observing that modern courts have "permitted conversion claims against intangible interests such as checks and customer lists"). But not all intangible interests are convertible. The Ninth Circuit applies a three-part test to determine

11

United States District Court
Northern District of California

whether a property right exists in intangible property: "First, there must be an interest capable of precise definition; second, it must be capable of exclusive possession or control; and third, the putative owner must have established a legitimate claim to exclusivity." *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003); *see also PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 395 (Cal. App. 2007) (noting that that conversion concerns a "hostile act of dominion or control over a specific chattel to which the plaintiff has the right of immediate possession" and explaining that an intangible like money is a proper subject of conversion only when it can be "identified as a specific thing"). It is not clear that the Blue Cubed satisfies this test. But Neuron has not challenged this element of Blue Cubed's conversion claim. Neuron moved to dismiss the conversion claim only on the grounds that "Blue Cubed has no ownership or right to possession of the property or data in question" under the parties' contracts. Dkt. No. 74 at 6.

Given the presumptions at the pleading stage, the Court will not dismiss the claim at this stage. This is without prejudice to further adjudication of this claim. However, the Court reiterates that a conversion claim appears to add little to nothing of substance to Blue Cubed's rights and remedies; the core of this action remains a contract dispute. The parties should discuss dropping this claim.

### C. Unjust Enrichment

As an initial matter, the parties agree that Blue Cubed's unjust enrichment claim sounds in quasi-contract. "[A]n implied-in-law contract or quasi-contract is not based on the intention of the parties, but arises from a legal obligation that is imposed on the defendant." *Unilab Corp. v. Angeles-IPA*, 244 Cal. App. 4th 622, 639 (Cal. App. 2016). "The right to restitution or quasi-contractual recovery is based upon *unjust enrichment*. Where a person obtains a *benefit* that he or she may not *justly retain*, the person is unjustly enriched. The quasi-contract, or contract 'implied in law,' is an *obligation* … created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his or her former position by return of the thing or its equivalent in money." *Id.* (emphasis in original). "[A]n action in quasi-contract [] does not lie

12

when an enforceable, binding agreement exists defining the rights of the parties." *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996).

Blue Cubed alleges that Neuron was unjustly enriched by actions Blue Cubed took to customize the Flight Unit No. 1 in preparation for the test flight. Blue Cubed alleges that in the lead up to the test flight, it "customized Flight Unit No. 1 in a variety of ways, including implementing a custom Ethernet interface, conducting custom vibration testing, and expediting fees to fabricators in order to meet the delivery timeline." CC at 91. As alleged, these actions to customize the unit for the Impulse Space test flight provided Neuron with a benefit, and were done with the expectation by Blue Cubed that Neuron would share the data and test results from the flight. Blue Cubed contends that Neuron's ultimate refusal to share this data rendered its enrichment from Blue Cubed's labor on the test flight unjust.

The parties dispute whether the unjust enrichment that Blue Cubed alleges is covered by the Subcontractor Agreement, precluding an unjust enrichment claim. The Subcontractor Agreement undisputedly required Blue Cubed to develop Flight Unit No. 1 and prepare that unit for various forms of testing. The ultimate goal of the agreement was to create a flight-ready unit and design that could be used in demonstrations. Dkt. No. 4.4 at 27 ("Assuming one terminal is reserved for engineering evaluation, the outcome of the prototype development activity will be a pair of lasercom terminals that can be integrated by one or two space service providers to demonstrate an OISL in space."). However, the Agreement goes on to explicitly state that "[a] flight demonstration, however, is outside the scope of this SOW." *Id.* Further, Blue Cubed alleges that in recognition of the fact that the flight demonstration was not covered by an agreement, the parties sought to develop a collaboration agreement, though no agreement was ultimately signed. CC ¶¶ 38-40. According to Blue Cubed, this demonstrates that both parties understood work on the test flight to be outside the scope of the Subcontractor Agreement.

The work that Blue Cubed seeks to recover for in its unjust enrichment claim is narrow — customizations to the unit required to facilitate the specific test flight with Space Impulse, as opposed to general work to qualify the unit. Blue Cubed describes the work as including "implementing a custom Ethernet interface, conducting custom vibration testing, and expediting

13

fees to fabricators in order to meet the delivery timeline." CC ¶ 91.  Drawing inferences in favor of Blue Cubed, this customization was work that was only required and useful for that particular test flight and did not go towards Blue Cubed's contracted work under the Subcontractor Agreement.  Given the explicit language in the contract stating that the flight demonstration is outside the scope of work, and Blue Cubed's allegations about the parties' efforts to separately contract to cover such work, Blue Cubed has stated a claim as to the segment of work that relates to customizing the unit specifically for the Space Impulse test flight.

Neuron's motion to dismiss is therefore **DENIED**.

### D.  Intentional Interference with Contractual Relations

"The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption  of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (Cal. 1990).  "[I]nterference with the plaintiff's performance may give rise to a claim for interference with contractual relations if plaintiff's performance is made more costly or more burdensome." *Id.* at 1129.  But "[t]he mere possibility of actual breach or disruption is not sufficient to sustain an intentional interference with contract claim." *Avenmarg v. Humboldt Cty.*, No. 19-cv-05891-RMI, 2020 U.S. Dist. LEXIS 138889, at *48 (N.D. Cal. Aug. 4, 2020).

Blue Cubed alleges that (1) that it has a business relationship with HawkEye and Hood Tech, including a sales contract with HawkEye; (2) Neuron knew of these relationships; (3) Neuron has represented to HawkEye and Hood Tech that Blue Cubed has breached its agreement with Neuron, misappropriated Neuron's trade secrets, and that its sales of its OCTs violates the contract; and (4) that these representations have "made Blue Cubed's performance of its contract [with Hawkeye] more difficult by causing confusion with HawkEye and Hood Tech." CC ¶¶ 105-109.  Blue Cubed further alleges that "If Blue Cubed cannot deliver the OCTs to HawkEye, or has to find another gimbal provider and redesign the OCT to accommodate a new gimbal, it will incur

14

significant expense. Such a redesign would also prevent it from timely completing the OCTs owed Hawkeye or cause HawkEye to terminate the contract." *Id.* ¶ 111.

But Blue Cubed does not point to any disruption of the contract that has actually transpired and is thus more than speculative. Indeed, at oral argument, counsel for Blue Cubed admitted that the deal between HawkEye and Blue Cubed "is proceeding" and that the intentional interference claims relates only to "potential risk" going forward. *Compare Pac. Gas & Elec. Co.*, 50 Cal. 3d at 1126 (no actual disruption where sales contract at issue continued to operate, even if made "more expensive or burdensome" by defendant's actions) *with Shamblin v. Berge*, 166 Cal. App. 3d 118 (Cal. App. 1985) (actual disruption where defendant warned off potential buyers of real estate, causing rescission of sales contract). Blue Cubed fails to satisfy the actual disruption element of the intentional interference claim.

Accordingly, Neuron's motion to dismiss the intentional interference claim is **GRANTED**. Dismissal is with leave to amend if factual circumstances change, such that actual disruption to the contract materializes.

### E. Commercial Disparagement

The tort of "commercial disparagement" denotes the "same basic legal claim" as "trade libel" and "slander of goods" – it is a specific example of the "more general principle of injurious falsehood." *Hartford Cas. Ins. Co. v. Swift Distribution, Inc.*, 59 Cal. 4th 277, 289 (Cal. 2014). Disparagement in the commercial context, "mean[s] a knowingly false or misleading publication that derogates another's property or business and results in special damages." *Id.* at 291. Allegations are not "defective for failure to state the exact words of the alleged slander," particularly when "it appears that defendant has superior knowledge of the facts." *Okun v. Superior Court*, 29 Cal. 3d 442, 458 (Cal. 1981).

"[S]tatements of *opinion* rather than fact cannot form the basis for a libel action" – or a disparagement action. *Campanelli v. Regents of the Univ. of Cal.*, 44 Cal. App. 4th 572, 578 (Cal. App. 1996) (emphasis in original); *see also ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1011, 113 Cal. Rptr. 2d 625, 641 (2001) ("[O]pinions will not support a cause of action for

15

trade libel); *Deerpoint Grp., Inc. v. Agrigenix, LLC*, 393 F. Supp. 3d 968, 988 (E.D. Cal. 2019) (statements of opinion not actionable for commercial disparagement claim); *Thimes Sols. v. TP-Link USA Corp.*, No. 2:19-cv-10374-SB-E, 2022 U.S. Dist. LEXIS 202913, at *8 (C.D. Cal. Nov. 3, 2022) (no "material difference between proving a false representation in a libel case and proving one in a trade libel case").

Courts have tended to find that statements expressing "a good faith belief that another party is infringing its [IP]" are "unactionable opinion" under this test. *Thimes Sols.*, 2022 U.S. Dist. LEXIS 202913, at *11; *see also Hgci, Inc. v. Luxx Lighting, Inc.*, No. EDCV 19-570 PSG (KKx), 2020 U.S. Dist. LEXIS 187676, at *9 (C.D. Cal. Sep. 10, 2020) (email from competitor to client stating that competitor "believe[d] [plaintiff] infringed on our patents for our optics" was nonactionable); *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, No. CV 10-5696 CRB, 2013 U.S. Dist. LEXIS 95685, at *17-18 (N.D. Cal. July 9, 2013) ("statements reflecting [defendant's] belief that" the product at issue "infringed on [its] intellectual property rights" might be provable as true or false after a lengthy jurisdiction-sensitive lawsuit, but looking at [the relevant factors], the Court concludes that [the] statements were merely expressions of opinion, not assertions of objective fact").

On the other hand, statements that falsely accuse a company of crimes or questionable business practices can be actionable as libel per se. California appellate courts have distinguished between "classes of statements concerning the goods of a competitor, first, where the statement is made with reference to goods or products, but there is also included libelous words concerning the seller, which impute to him, in connection with the sale of such goods, fraud, dishonesty or questionable business methods; and, secondly, statements that go no further than to criticize the goods of a competitor, which criticism is based upon or appeals to a personal taste or preference of the buyer, but contains no imputation against the honesty or integrity of the merchant in the sale of the goods." *Barnes-Hind, Inc. v. Superior Court*, 181 Cal. App. 3d 377, 385 (Cal. App. 1986) (citing *Rosenberg v. J. C. Penney Co.*, 30 Cal. App. 2d 609, 621 (1939)). The former category may be libel per se. *Id.*; *see also Henley v. Jacobs*, No. C 18-2244 SBA, 2018 U.S. Dist. LEXIS 235733, at *12 (N.D. Cal. Dec. 21, 2018) (accusation of hacking, stealing trade secrets, and

16

United States District Court
Northern District of California

wiretapping was sufficient to state libel per se claim); *Mann v. Quality Old Time Serv., Inc.*, 120 Cal. App. 4th 90, 106 (Cal. App. 2004) (statements that business was "using an illegal chemical and illegally dumping the solution down city and storm drains" qualified as slander per se under Civ. Code, § 46, par. 1). If libel is per se, the party asserting the claim need not show special damages. *Barnes-Hind*, 181 Cal. App. 3d at 382 (party that "can plead and prove libel per se [] need not prove special damages").

Here, Blue Cubed alleges that "Neuron has misrepresented the scope of Blue Cubed's ownership of IP developed under the Subcontractor Agreement, Blue Cubed's license to Neuron's IP under the Subcontractor Agreement, and Neuron's license to Blue Cubed's IP to numerous third parties," CC ¶ 121, "Neuron has told HawkEye that Neuron owns the OCTs Blue Cubed is selling and that Blue Cubed does not have the right to sell the OCTs to HawkEye," *id.* ¶ 53, "has misrepresented to Hood Tech that Blue Cubed is breaching the contract between Neuron and Blue Cubed and misappropriating Neuron's trade secrets by selling OCTs," *id.* ¶ 108, and "has also misrepresented to Hood Tech and Blue Cubed that Hood Tech's sales of gimbals to Blue Cubed would violate terms of an agreement between Hood Tech and Neuron" *id.* ¶ 116. However, at oral argument, Blue Cubed clarified that that its claim centers on Neuron making known to third parties its interpretation of the contracts at issue in this case – an interpretation that Blue Cubed contends is knowingly false.

On the spectrum between unactionable opinion statements about the scope of a parties' legal rights on the one hand and libelous accusations of misconduct on the other, Neuron's alleged statements, as clarified at oral argument, fall on the nonactionable side. Neuron does not commit commercial disparagement when it expresses its good-faith opinion as to its legal rights and Blue Cubed's limitations under the various agreements, so long as those statements do not tip into outright allegations of misconduct. Blue Cubed does not appear to allege that Neuron has crossed that line. Blue Cubed's commercial disparagement claim is therefore **DISMISSED** with leave to amend if factual circumstances change such that Neuron crosses the line into allegations of crimes or intentional torts such as trade secret theft. But legal arguments disputing legal rights under a contract, as appear to be alleged herein, are not actionable.

United States District Court
Northern District of California

**F. Breach of Fiduciary Duty against Mr. Husseini**

Mr. Husseini contends that Blue Cubed's counterclaim against him for Breach of Fiduciary Duty is procedurally improper under Rules 13, 19, and 20.

Blue Cubed purports to find jurisdiction for its counterclaims under Rule 13, which governs compulsory counterclaims. CC ¶ 6. "In order for a defending party to assert a compulsory counterclaim, the claim must be raised against an existing party." *Hawkins v. Berkeley Unified Sch. Dist.*, 250 F.R.D. 459, 462 (N.D. Cal. 2008). Rule 13(h) does allow a party to join additional parties, not original to the litigation, in a counterclaim via Rules 19 and 20. *See* Fed. R. Civ. P. 13(h) ("Joining Additional Parties. Rules 19 and 20 govern the addition of a person as a party to a counterclaim or crossclaim."). However, this Court and others have held that Rule 13(h) "requires that any such joinder of a new party be anchored to a counterclaim or cross-claim against an original party." *Hawkins*, 250 F.R.D. at 462. In other words, "a counterclaim 'may not be directed solely against persons who are not already parties to the original action,' but rather the third party must be joined to a counterclaim asserted against the original plaintiff." *Muskegon Holdings LLC v. VP LB13 LLC*, No. 8:23-cv-01302-DOC-JDEx, 2024 U.S. Dist. LEXIS 112480, at *7 (C.D. Cal. Apr. 25, 2024) (citing 6 Wright & Miller, Fed. Prac. & Proc, Civ.2d § 1435, at 270-71 (1990)). Only if this requirement is met, does the Court proceed to determine if the joinder of an additional parties is proper under either Rule 19 or Rule 20. *Springfield Clinic, LLP v. Primex Clinical Labs., Inc.*, No. CV 21-03595-RSWL-ASx, 2022 U.S. Dist. LEXIS 79565, at *6-7 (C.D. Cal. Apr. 29, 2022).

Here, Blue Cubed asserts a counterclaim against A.Z. Husseini and DOES 1-10 (other hypothetical corporate officers and directors[2]) for breach of fiduciary duty. CC at Count Eleven. Mr. Husseini and the unnamed Does were not original parties to this action; the only Plaintiff in this case is Neuron, against which Blue Cubed does not assert a fiduciary claim. Count Eleven is thus a counterclaim directed solely against a new party to the action, and does not qualify as a

---

[2] Mr. Husseini provides a declaration that there are no such other officers and directors. *See* Dkt. No. 73-2 ¶ 2 (stating that Mr. Husseini is and has "always been" the "only director or officer of Neuron").

18

compulsory counterclaim.

Blue Cubed also argues that its claim against Mr. Husseini should be joined permissively under Rule 20(a), as arising out of the same series of transactions and occurrences as its other claims. Rule 20(a) imposes two specific requirements for the permissive joinder of parties: (1) a right to relief must be asserted by, or against, each plaintiff or defendant relating to or arising out of the same transaction or occurrence or series of transactions or occurrences; and (2) some question of law or fact common to all parties must arise in the action. *Desert Empire Bank v. Ins. Co. of N. Am.*, 623 F.2d 1371, 1375 (9th Cir. 1980).

Here, it is difficult to find a common transaction or question of law or fact that binds Blue Cubed's fiduciary claim against Mr. Husseini to its other claims against Neuron. The core of Blue Cubed's claim is that Mr. Husseini, as director of Neuron, violated his duties of care, loyalty, and candor to minority shareholder Blue Cubed by failing to hold shareholder meetings or provide Blue Cubed with certain information about the company. CC ¶ 132. These actions – or inactions – are not tied to the main course of conduct at issue in Blue Cubed's other counterclaims: Blue Cubed's and Neuron's rights, obligations, and alleged violations of the IP Agreement and the Subcontractor agreement relating to the development and sale of OCTs. To prove the asserted counterclaims against Mr. Husseini claims, Blue Cubed would proffer information about Neuron's internal corporate management, but this is unconnected to the claims at issue between the two companies.

Blue Cubed attempts to tie its fiduciary claim to its other claims through the fact that it received its shares in the Neuron entity as consideration for the IP Agreement. But nothing about Blue Cubed's fiduciary claim depends on the source of its shares. If Mr. Husseini has breached his fiduciary duties, it does not matter how Blue Cubed first became a shareholder, only that it has been mistreated since. There is no common transaction here. That Blue Cubed may suffer loss of value as a shareholder because of Neuron's legal dispute with Blue Cubed does not establish a breach of fiduciary duty owed to Neuron's shareholders as alleged in the putative counterclaim.

Blue Cubed's claim against Mr. Husseini does not satisfy the standards for compulsory counterclaim or permissive joinder. The claim is therefore **DISMISSED** without prejudice to

refiling it as an independent action.  While the Court will not opine here on the merits of the claim, the Court advises that before re-filing, Blue Cubed carefully evaluate whether it really has a claim which can properly be asserted.  It should consider its obligations under Rule 11.

### III.    CONCLUSION

Mr. Husseini's motion to dismiss is **GRANTED**.

Neuron's motion to dismiss is **GRANTED** in part and denied in part, as follow:

- Neuron's motion to dismiss the claim for Breach of the Implied Covenant of Good Faith and Fair Dealing is **DENIED**

- Neuron's motion to dismiss the claim for Conversion is **DENIED**

- Neuron's motion to dismiss the claim for Unjust Enrichment is **DENIED**

- Neuron's motion to dismiss the claim for Intentional Interference with Contractual Relations is **GRANTED**.  Blue Cubed may amend based only on new factual developments.

- Neuron's motion to dismiss the claim for Commercial Disparagement is **GRANTED**. Blue Cubed may amend based only on new factual developments.

**IT IS SO ORDERED**.

Dated:  4/9/2026

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

20