United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NEURON SPACE CORPORATION,
Plaintiff,

v.

BLUE CUBED, LLC,
Defendant.

Case No. 25-cv-06649-EMC

**ORDER GRANTING IN PART AND DENYING IN PART CROSS MOTIONS FOR SUMMARY JUDGMENT**

Docket No. 117, 119

This is a contract and intellectual property dispute between two start-ups—former partners—in the space optical communications industry. The parties cross-move for summary judgment. Plaintiff/Counterclaim Defendant Neuron Space Corporation moves for partial summary judgment on elements of its breach of contract claim and on Defendant/ Counterclaim Plaintiff Blue Cubed LLC's counterclaims for breach of contract, conversion, and tortious interference. Blue Cubed moves for summary judgment on all of Neuron's claims (breach of contract, trade secret misappropriation, tortious interference, and unfair competition).

For the reasons stated below, the Court **GRANTS** in part and **DENIES** in part Neuron's motion for summary judgment and **GRANTS** in part and **DENIES** in part Blue Cubed's motion for summary judgment. This order resolves some but not all of the claims in this case.

## I. BACKGROUND

### A. Factual Background

Blue Cubed is a Colorado-based start-up founded in 2018 by three engineers, Ryan Kingsbury, Scott Palo, and Jonathan Twichell. Neuron is a California-based start-up founded in 2020 by A.Z. Husseini. Both companies were interested in solving the technical problem of

United States District Court
Northern District of California

communication between satellites in space. Satellites operate in space in various altitudes: Low Earth Orbit (LEO), Middle Earth Orbit (MEO), and High Earth Orbit (HEO). LEO is typically defined as an altitude no higher than 2,000 km above earth. Satellites operating in LEO are smaller than ones that operate higher in space, generally cheaper to fly, and often operate in "clusters" or "constellations." Because these satellites fly close to earth, they take less time to send signals to earth and back ("low latency").

While these space satellites (and their networks) have proliferated, communication between satellites in LEO (and between LEO satellites and earth) presents ongoing difficulties. LEO satellites move very fast, making radio communications challenging. One alternative method of communicating between space satellites is optical communication. Instead of sending radio waves, optical communication involves the use of laser beams to send messages. For optical communication to be viable on LEO satellites, the Size, Weight, and Power ("SWaP") of the optical communication unit must be minimized to fit the smaller size of LEO satellites.

The Blue Cubed-Neuron Collaboration

In 2019, Blue Cubed had a pending patent application for an optical transceiver – a device that uses a beam of light to transport data from a transmitter to a receiver. The patent (issued in 2022) describes a method for simplifying such "free-space optical communication" by solving problems of "pointing" optical terminals. *See* U.S. Patent No. 11,258,514, "Single Aperture Optical Transceiver." During 2019, Blue Cubed gave several presentations on the potential use cases for its technology. Blue Cubed described optical communications as "mostly a pointing problem" and pitched its company as filling "core needs" for "Optical Inter-Satellite Links optimized for small satellites." Dkt. No. 120-6. In another presentation, Blue Cubed described its technology as a solution for large-range crosslink challenges "near earth-grazing LEO." Dkt. No. 120-5.

On September 1, 2020, Blue Cubed was contacted by Mr. Husseini, the founder and CEO of Neuron, a start-up interested in developing a satellite communication network in LEO. Dkt. No. 119-1. Mr. Husseini stated that given Blue Cubed's interest in free-space optical

communication in LEO, he saw a "tremendous opportunity for collaborating" to bring "the vision of [his] new company into reality." *Id.* Blue Cubed was "enthusiastic" and the two companies began to discuss what a collaboration might entail. Dkt. No. 115-8. Mr. Husseini explained that he was interested in securing an exclusive license to Blue Cubed's optical bench technology. *Id.* On October 23, 2020, Mr. Husseini sent an email elaborating on the specifics of the scope of the IP license he envisioned. *Id.* He proposed that Blue Cubed would be "free to sell [its] unit to any scientific or commercial customers (no restrictions based on application or vertical) but that a cap of 50 units per customer every 5 years would be placed." *Id.* He stated that Neuron was not opposed to Blue Cubed selling more than 50 units if the application were "non-competitive" and suggested a clause allowing Neuron to approve sales of more than 50 units to one company if Neuron deems that company non-competitive. *Id.* In short, Neuron sought to allow commercialization of Blue Cubed's technology but to limit its competition with Neuron's envisioned communications network.

On February 23, 2021, the parties signed a Memorandum of Understanding. Dkt. No. 121-3. The MoU states that Neuron is a technology start-up "developing an in-space network in LEO that will deliver a suite of services to both remote sensing operators and data analytics providers. Neuron's solution will rely in part on utilizing optical inter satellite links (OISLs) to deliver connectivity to space assets." *Id.* Blue Cubed is a defense and space technology company that "provides satellite crosslink and downlink solutions adaptable to mission requirements. Their novel solution portfolio includes both RF [radio frequency] and optical communications products. Among these solutions is a modular laser community unit currently under development, which promises wide field-of-view coverage." *Id.* The intent of the parties memorialized in the agreement was to enter into a formal agreement once Neuron secured funding that would "enable deployment of the first payloads for an in-space demonstration of OISL." *Id.* The "main goal" of the formal agreement would be to "provide Neuron with the requisite subcomponents and supporting the in-space demonstration through a purchase agreement." *Id.* The MoU stated that "Blue Cubed shares the view that Neuron's data relay service could benefit Blue Cubed by creating substantial demand for the requisite OISL subcomponents. This large potential demand

would undoubtably profit Blue Cubed through sales, licensing, or revenue sharing from a potential Neuron network utilizing Blue Cubed technology." *Id.* The MoU envisioned that Blue Cube would supply an important component of the optical communication technology that would power Neuron's proposed satellite communications network.

In May, 2021, the parties exchanged emails discussing concrete contractual terms. Dkt. No. 119-55. Mr. Husseini proposed a two-part agreement where Blue Cubed would give Neuron an exclusive license for the application of Communications as a Service, in return for 10% of Neuron's equity. *Id.* Mr. Husseini wrote that "The 10% equity is based on the fact that Neuron does not own the IP, nor does it place any quantity caps on BlueCubed for manufacturing/selling the box." *Id.* He proposed that, "Tentatively, one definition of CaaS can be: 'Communication as a service is defined as a space-borne entity providing access to any infrastructure for the purpose of transporting data which originates from any space asset(s) owned or operated by a different entity.'" *Id.* The second stage of the agreement would be a "full purchase [by Neuron] of the IP (no license back)." *Id.* Mr. Bellusci, counsel for Blue Cubed, proposed adding an altitude limitation that would "free" up Blue Cubed for "GEO/Lunar and up/downlinks" (that is, for communications in higher orbits and downward and upward from LEO). *Id.* This would allow Blue Cubed to sell its product in markets that did not compete with Neuron's proposed LEO network. Mr. Bellusci noted that Blue Cubed also had an interest in other uses, including the secure sharing of encryption keys, that Blue Cubed believed would fall outside of CaaS, regardless of altitude. *Id.* For these use cases not covered by CaaS, Mr. Bellusci stated that Blue Cubed would need an explicit license back. *Id.*

<u>The Blue Cubed-Neuron IP License Agreement</u>

On July 19, 2021, Neuron and Blue Cubed entered into an IP licensing agreement (the "IP License") licensing Blue Cubed's optical technology. Dkt. No. 18-1. Neuron obtained an exclusive license to the Blue Cubed IP, defined as Blue Cubed's provisional patent application "Single Aperture Optical Transceiver," associated know-how, and improvements to the Blue Cubed optical communications terminals developed by Blue Cubed for the next 5 years. *Id.* The

license was limited in scope to "use in providing Communication-as-a-Service (CaaS) between spacecraft in low Earth Orbit (LEO)."

Relevant terms of the IP License are provided below:

> The Blue Cubed IP License:
> Blue Cubed, LLC hereby grants an exclusive, worldwide, royalty free, non-transferrable and irrevocable license of the Blue Cubed IP defined below to Neuron Space Corporation for use in providing Communication-as-a-Service (CaaS) between spacecraft in low Earth Orbit (LEO), where LEO is defined as between 100 and 2000 km of Earth surface. CaaS is defined as a space-borne entity in LEO providing access to any other space-borne entity in LEO for the purpose of transporting data originating from an asset(s) in space that is owned or operated by any third party. This license does not prohibit Blue Cubed, LLC from licensing the use of the Blue Cubed IP to an additional third-party licensee that is using the optical communication terminals to connect space-borne assets in LEO, wherein the space-borne assets are wholly owned by said third party licensee. This Licensing Agreement does not prohibit Blue Cubed, LLC from licensing the use of the Blue Cubed IP to any third-party licensee that does not compete with Neuron in the CaaS market such as for Position, Navigation and Timing. The License Agreement shall remain in effect until the Blue Cubed IP expires or Neuron is dissolved, whichever occurs first.
>
> Blue Cubed, LLC Anticipated Use of Blue Cubed IP
> Blue Cubed, LLC anticipates use of the Blue Cubed IP to sell Blue Cubed optical communication terminals for use in spacecraft that are not providing CaaS in LEO as defined above. Neuron will produce the optical communication terminals and sell the optical communication terminals at then actual production cost to Blue Cubed, LLC along with blueprints, firmware and software source code, and any testing data that is available.

The IP License was negotiated by Mr. Bellusci for Blue Cubed and Mr. Husseini for Neuron. Mr. Bellusci testified in deposition that in the CaaS definition, "space-borne entity" refers to a satellite. Dkt. No. 116-4. He testified that "asset in space" also refers to a satellite. *Id.* He further testified that the first satellite would be a Neuron satellite or space on which Neuron rented a terminal and the second satellite would be Neuron's customer. *Id.* He testified that his understanding of Neuron's business model was that it could either own its own satellites or rent space on others' satellites. *Id.* He testified that a "third party" meant a party other than Blue Cubed or Neuron. *Id.* Mr. Husseini testified in deposition that a third party meant anyone other than Blue Cubed or Neuron. Dkt. No. 115-6, Ex. 8. He testified that he understood Blue Cubed to have a carve-out to license their IP to a one additional third-party licensee in LEO. *Id.* His

understanding at the time was that Blue Cubed might be able to sell to a single large constellation operator. *Id.*

Mr. Husseini also testified that he understood Blue Cubed's potential markets, outside of Neuron's CaaS use case, to include "PNT [Position, Navigation, and Timing], point and navigation" as well as "higher orbits, MEO [medium earth orbit], GEO [geostationary-Earth orbit], lunar, aerospace, maritime, terrestrial." Dkt. No. 138-12 at 66:11-18. He also testified that Blue Cubed could operate in "LEO to air, LEO to ground, LEO to sea, LEO to MEO, LEO to GEO." *Id.* at 82:21-83:3. In other words, Blue Cubed was free under the Licensing Agreement to facilitate communications between satellites in LEO and satellites in other orbits in space, or between LEO satellites and Earth, or to engage in other uses that did not involve communication, such as navigation.

<u>Blue Cubed and Neuron Seek Funding</u>

Following the IP License Agreement, Neuron pitched its business in various contexts and presentations to seek funding. Neuron and Blue Cubed collaborated on multiple pitches to the Defense Innovation Unit (DIU) of the Department of War, a government department that funds private entrepreneurship with potential strategic utility. The DIU has a strategic interest in facilitating satellite communications.

On June 8, 2021, Neuron submitted a proposal to DIU. Dkt. No. 119-9, Ex. 12. In the proposal, Neuron began by outlining the problem of "downlink" – the transmit of information from satellites down to Earth. Downlink suffers from latency issues and acts as a "bottleneck" to receipt of timely information from satellites. Neuron posited as a solution to the problem of latency in downlink creating a network of "inter satellite links," where "data is beamed satellite-to-satellite for immediate routing to a ground station. *Id.* Neuron observed that while the physics of creating such a "transport layer" were clear, the economics were not, listing many attempts to create such a layer and noting that "[t]rue cross-vendor interoperability has yet to be demonstrated in space." *Id.*; *see also* Dkt. No. 119-4 (creating such a communication layer a "solvable problem from a technical standpoint, but the real difficulty is cracking the economics"). Neuron pitched its

innovation as "novel architecture" with "pure hosted optical payload architecture" allowing ubiquitous real-time connectivity hardware. Dkt. No. 119-9. A pure-hosted payload architecture means that Neuron, instead of launching its own satellites to form a transport layer, would have its optical communication terminals hosted on satellites it does not own. *Id.* There would be "no licensing requirement" for the satellites that hosted Neuron's terminals because "Neuron is a OISL pure-play." *Id.* By focusing on proliferating its terminals, as opposed to charging for them, Neuron would be able to take advantage of network effects and lock-in hardware and software built around its technology. *Id.* The presentation envisions a "high volume production" of terminals, rapid deployment, economies of scale, and network effects as elements of Neuron's business model. *Id.* The presentation also describes the "Blue Cubed Solution" of "lower SWaP [Size, Weight, and Power]," better manufacturability, and modularity. The presentation states that "Neuron has secured an exclusive IP license Blue Cubed LLC for the Communications-as-a-service use case in LEO." *Id.*




*Dkt. No. 119-3 at p.9 (Neuron's proposed technical architecture)*

In a Neuron presentation on February 10, 2022, Neuron stated that "Neuron's proposing maturation of the necessary hardware, including core optics and gimbals, to build a pure hosted-payload space transport layer. . . . By focusing on hardware product that is easy to buy, install, and



United States District Court
Northern District of California

use, Neuron will build a satellite connectivity service that strictly dominates other international efforts." Dkt. No.119-3, Ex. 6. Neuron will "link[] out-of plane satellites from different constellations." *Id.* The presentation outlines a plan to develop a prototype, build manufacturing capacity, deploy minimum viable network, commence high volume production, and deploy full orbital shell for universal service." *Id.*

In a February 14, 2022 white paper, Neuron elaborated further on its planned business model, stating that "the Neuron communication service" would "charge[] a fee-per-use" and that its "highest commercial viability lies in the operation of a network, and the offering and coordinating of a service to customers, rather than the sale of individual units." Dkt. No. 119-5, Ex. 8. Neuron described its business model as "a direct analogy to AT&T's historic commercial dominance from investments in long-distance communication lines and centralized circuit-switched phone call routings." *Id.*

<u>The Defense Innovation Unit Contract and the Subcontractor Agreement</u>

In the summer of 2022, the DIU accepted Neuron's pitch to build three prototype compact optical terminals, with the goal of a test flight demonstration. Neuron and Blue Cubed entered into a Subcontractor Agreement, in which Blue Cubed would build the optical component of the terminals. Dkt. No. 4-4. A third-party, Hood Tech, was responsible for the gimbal portion of the terminals.

Relevant portions of the Subcontractor Agreement include:

> <u>Section 9.1.2:</u>
> The Company [Neuron] agrees that Subcontractor [Blue Cubed] has existing IP being used for the execution of their obligations under this Agreement. The Company agrees that any and all improvements made to Subcontractor's IP (inventions, copyrights, trade secrets, derivative works, source code and any other proprietary information, confidential information, designs, data or know how, etc.) shall remain property of Subcontractor. Subcontractor agrees that IP related to the optics/gimbal interface effort (inventions, copyrights, trade secrets, derivative works, source code and any other proprietary information, confidential information, designs, data or know how, etc.) developed under this Agreement shall be property of the Company, subject to limitations due to Company's obligations to any third party regarding the IP related to the optics/gimbal interface effort. Both Parties agree that any IP generated under this Agreement shall be licensed to the other Party, subject to limitations due to Company's obligations to any third party regarding the

> IP related to the optics/gimbal interface effort. Subcontractor hereby agrees to immediately deliver all Company owned intellectual property to Company upon termination of this Agreement or upon any such request or notice by Company.
>
> Subcontractor hereby agrees to ensure all of subcontractor's employees and contractors are bound by a duty to assign such intellectual property rights to Company. Subcontractor hereby agrees and warrants that such intellectual property will not be disclosed to any third-party projects or products without Company's prior written approval. Subcontractor hereby agrees subcontractor has a duty to Company to take all actions to identify, protect and secure the intellectual property in a timely manner, as if such intellectual property were owned by subcontractor. Company agrees to pay Subcontractor for time spent in perfecting Company IP under this Agreement at Subcontractor's current market billing rate.
>
> 9.4 Use Case Restrictions. Nothing in this agreement shall confer to Company [Neuron] a license to use any software, copyrighted material, data, or hardware generated under this Agreement for purposes outside of the licensed use case of Communication-as-a-Service (CaaS) market. CaaS includes any data communication between space-borne entities in low Earth Orbit (LEO), where LEO is defined as between 100 and 2000 km of Earth surface. CaaS can also include a space-borne entity in LEO providing access to any other space-borne entity in LEO for the purpose of transporting data originating from an asset(s) in space that is owned or operated by any third party.
>
> 11.5 Software Use Case Restrictions. Nothing in this agreement shall confer to Company a license to use any software, copyrighted material, data, or hardware generated under this Agreement for purposes outside of the licensed use case of Communication-as-a-Service (CaaS) market. CaaS includes any data communication between space-borne entities in low Earth Orbit (LEO), where LEO is defined as between 100 and 2000 km of Earth surface. CaaS can also include a space-borne entity in LEO providing access to any other space-borne entity in LEO for the purpose of transporting data originating from an asset(s) in space that is owned or operated by any third party.
>
> Section 15: Title to and Disposition of Property. The Company [Neuron] and/or Government, where applicable, will not take title to Subcontractor acquired or produced property, except property the agreement identifies as deliverable property, unless the parties agree otherwise. Title to all other property shall remain with the Subcontractor.

The Impulse Space Test Flight

Working as subcontractors under the Subcontractor Agreement, Blue Cubed and Hood Tech collaborated to build a prototype unit, the first of three prototypes contemplated by the Subcontractor Agreement. Although the DIU provided 1.25 million in funds under the agreement, Blue Cubed also invested funds it raised for the project, including $920,000 from the Air Force

and $375,000 from the State of Colorado. Dkt. No. 121-29 at ROG 4. Blue Cubed developed the optical bench and Hood Tech was responsible for the gimbal. The two subcontractors worked together to integrate the components into a compact terminal. Neuron calls this terminal the "Neuron Node" (pictured below left). Blue Cubed calls its version of the terminal the "Cobalt" (pictured below right).





In late 2024, Neuron secured a test flight opportunity for the prototype unit with Impulse Space, a space transportation company. Blue Cubed provided the first prototype to Neuron for the test flight. On November 28, the Impulse flight launched. The first prototype remains in space on the Impulse flight. When Blue Cubed built the second prototype terminal, it did not provide it to Neuron.

Blue Cubed's Marketing of Cobalt and the Hawkeye 360 Contract

Beginning in 2023, Blue Cubed began marketing the prototype terminal under the name Cobalt. Blue Cubed pitched its terminal as "an Ethernet connection between your spacecraft." Dkt. No. 119-21. In April of 2025, Blue Cubed signed a purchase agreement with HawkEye 360 (HE360) for sale of Cobalt terminals "for use in Purchaser's constellation of satellites." Dkt. No. 116-1. HawkEye 360 is a geospatial analytics company that operates using clusters of LEO satellites to gather intelligence.

**B. Procedural History**

In August, 2025, Neuron sued Blue Cubed for (1) breach of the Subcontractor Agreement; (2) breach of the IP License Agreement; (3) anticipatory breach; (4) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"); (5) false designation of origin under the Lanham Act; (6) tortious interference with prospective economic advantage; (7) unfair competition under Cal. Bus. & Prof. Code § 17200; and (8) fraudulent inducement. Dkt. No. 1. Neuron contended that Blue Cubed breached the Subcontractor and IP License agreements by failing to deliver terminal prototypes, selling the prototype terminals in violation of Neuron's exclusive license, failing to seek Neuron's permission to make such sales, and failing to notify Neuron of such sales. Neuron contended that marketing materials shared by Blue Cubed as part of its marketing of the Cobalt terminal disclosed Neuron trade secrets. Neuron also contended that Blue Cubed's sale contract with HawkEye360 constituted tortious interference with a prospective economic partner of Neuron. The Court denied Neuron's motions for a Temporary Restraining Order and for Preliminary Injunction in which Neuron sought to enjoin Blue Cubed from "displaying, disclosing, or selling" the Cobalt terminal. Dkt. No. 23, 37. When Blue Cubed moved to dismiss Neuron's claims, the Court denied Blue Cubed's motion to dismiss in part, but granted dismissal of Neuron's claims for anticipatory breach, Lanham Act, and fraudulent inducement. Dkt. No. 61.

Blue Cubed counterclaimed, asserting claims for (1-2) Breach of Contract, (3) Breach of Implied Covenant, (4) Conversion, (5) Unjust Enrichment, (6) Trade Secret Misappropriation, (7) Intentional Interference with Contractual Relations, (8) Tortious Interference with Prospective Economic Relations, (9) Commercial Disparagement, and (10) Unfair Competition. Dkt. No. 63. Blue Cubed alleged that Neuron has exceeded the scope of its license to Blue Cubed's IP, disclosed Blue Cubed trade secrets, and interfered with Blue Cubed's commercialization of its technology. Blue Cubed also brought a claim for Breach of Fiduciary Duty against A.Z. Husseini, the director and CEO of Neuron. *Id.* The Court granted in part and denied in part Neuron's motion to dismiss the counterclaims. Dkt. No. 98. The Court dismissed the claim against Mr. Husseini, as well as Blue Cubed's claims for Commercial Disparagement and Intentional

United States District Court
Northern District of California

Interference with Contractual Relations, but did not dismiss Blue Cubed's remaining counterclaims. *Id.* After hotly contested discovery, *see* Dkt. Nos. 84, 88, 94, 105, 110, 137, these cross motions for summary judgment followed.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The construction of a contract, unless it turns on disputed facts, is a question of law." *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1388 (Cal. App. 2004).

## III. DISCUSSION

### A. Neuron's Claim for Breach of Contract

Under California law, the elements of a breach of contract claim are: "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff.'" *Reichert v. Gen. Ins. Co. of Am.*, 68 Cal. 2d 822, 830 (Cal. 1968).

In interpreting a contract, "the trial court gives effect to the mutual intention of the parties

as it existed at the time the contract was executed." *Brown v. Goldstein*, 34 Cal. App. 5th 418, 432 (Cal. App. 2019); *accord Sy First Family Ltd. P'ship v. Cheung*, 70 Cal. App. 4th 1334, 1341 (Cal. App. 1999) (the "court's paramount consideration … is the parties' objective intent when they entered into [the contract]").

"Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms." *Goldstein*, 34 Cal. App. 5th at 432 (internal citations omitted). A court "generally may not consider extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract" but "[e]xtrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous." *Id.*

If extrinsic evidence reveals that apparently clear language in the contract is, in fact, "susceptible to more than one reasonable interpretation," then extrinsic evidence may be used to determine the contracting parties' objective intent." *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.*, 69 Cal.2d 33, 39–40 (1968). "When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law. This is true even when conflicting inferences may be drawn from the undisputed extrinsic evidence or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation." *Id.* at 433; *see also Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1134 (Cal. 2008) ("[T]hat extrinsic evidence may reveal an ambiguity subjecting a contract to more than one reasonable interpretation does not mean resolution of that ambiguity is necessarily a jury question. Absent a conflict in the evidence, the interpretation of the contract remains a matter of law."). If the extrinsic evidence does not present a conflict of fact, it is error for the court to submit the question to the jury. *Wolf*, 162 Cal. App. 4th at 1134.

Although the court may consider extrinsic evidence, it "does not have the power to create for the parties a contract which they did not make, and it cannot insert in the contract language which one of the parties now wishes were there." *Levi Strauss & Co. v. Aetna Cas. & Surety Co.*, 184 Cal. App. 3d 1479, 1486 (Cal. 1986); *see also Bionghi v. Metro. Water Dist. of S. Cal.*, 70 Cal. App. 4th 1358, 1364-65 (Cal. App. 1999) (noting that a party cannot "smuggle extrinsic

United States District Court
Northern District of California

evidence to add a term to an integrated contract”).

“Evidence of the contracting parties’ conduct after executing the contract but before any controversy has arisen as to its effects afford the most reliable evidence of the parties’ intent.” *Kennecott Corp. v. Union Oil Co.*, 196 Cal. App. 3d 1179, 1189-90 (Cal. 1987).

1. Breach of the IP License via Sale of Terminals

Blue Cubed moves on whether its sale of terminals to HawkEye 360 (“HE360”) was a breach of the IP License, asserting that the sale to HE360 was not such a breach as a matter of law. Neuron does not directly move on this issue but moves on a related issue of contract interpretation concerning the meaning of “Communications-as-a-service.” Neuron’s exclusive license to the Blue Cubed IP embodied in the optical terminals is confined to the use case of “Communications-as-a-service,” setting this term at the heart of the parties’ dispute. Resolving both parties’ motions on this issue requires interpreting the scope and application of Neuron’s exclusive license under the IP License.

As a threshold matter, to the extent that Neuron has put at issue whether the sale of terminals breached Blue Cubed’s obligations under the *Subcontractor Agreement*, Neuron’s motion is denied. *See* Dkt. No. 138-3 at 17-18 (Neuron arguing that even if Blue Cubed could sell terminals under the IP License Agreement, that does not mean Blue Cubed could sell terminals under the Subcontractor Agreement); Dkt. No. 144-3 at 10. The Subcontractor Agreement nowhere provides Neuron with an exclusive license to any of the IP within the agreement. Rather, as discussed below, Neuron is assigned IP relating to the optics/gimbal interface, in which Blue Cubed is granted a cross-license—a license that is not limited by any particular use case (unlike the Neuron license, which is limited to “communications as a service” use case). The Subcontractor Agreement’s only use case limitation is on Neuron. *See* Dkt. No. 4-4 at 9.4 Use Case Restrictions; 11.5 Software Use Case Restrictions (limiting Neuron’s assignment/license to use within the Communications-as-a-service in LEO field of use). No such restriction applied to Blue Cubed, so its sale of its terminal to HE360 did not breach the Subcontractor Agreement.

The question is whether Blue Cubed’s sale of terminals breaches Neuron’s *exclusive* grant

of the Blue Cubed IP in its field of use under the ***IP License***.

Relevant terms of the IP License are restated below (Dkt. No. 18-1) (emphasis added):

> The Blue Cubed IP License:
> Blue Cubed, LLC hereby grants an ***exclusive***, worldwide, royalty free, non-transferrable and irrevocable license of the Blue Cubed IP defined below to Neuron Space Corporation ***for use in providing Communication-as-a-Service (CaaS) between spacecraft in low Earth Orbit (LEO), where LEO is defined as between 100 and 2000 km of Earth surface***. ***CaaS is defined as a space- borne entity in LEO providing access to any other space-borne entity in LEO for the purpose of transporting data originating from an asset(s) in space that is owned or operated by any third party***. ***This license does not prohibit Blue Cubed, LLC from licensing the use of the Blue Cubed IP to an additional third-party licensee that is using the optical communication terminals to connect space-borne assets in LEO, wherein the space-borne assets are wholly owned by said third party licensee***. This Licensing Agreement does not prohibit Blue Cubed, LLC from licensing the use of the Blue Cubed IP to any third-party licensee that does not compete with Neuron in the CaaS market such as for Position, Navigation and Timing. The License Agreement shall remain in effect until the Blue Cubed IP expires or Neuron is dissolved, whichever occurs first.
>
> Blue Cubed, LLC Anticipated Use of Blue Cubed IP
> Blue Cubed, LLC anticipates use of the Blue Cubed IP to sell Blue Cubed optical communication terminals for use in spacecraft that are not providing CaaS in LEO as defined above. Neuron will produce the optical communication terminals and sell the optical communication terminals at then actual production cost to Blue Cubed, LLC along with blueprints, firmware and software source code, and any testing data that is available.

The Court begins with Blue Cubed's argument that its sales to HawkEye 330 fall within an exception to Neuron's exclusive license. The IP License agreement states that "This license does not prohibit Blue Cubed, LLC from licensing the use of the Blue Cubed IP to an additional third-party licensee that is using the optical communication terminals to connect space-borne assets in LEO, wherein the space-borne assets are wholly owned by said third party licensee." Dkt. No. 18-1. The only evidence in the record is that HE360 purchased the Blue Cubed terminals in order to facilitate intersatellite communication between a cluster of its own satellites. The contract states that HawkEye360 "desires to purchase the Products from Seller for use in Purchaser's constellation of satellites." Dkt. No. 116-1. Eric Haengel, who was responsible for the Blue Cubed-HE360 purchase agreement, testified that HE360 purchased BlueCubed's satellites for intersatellite communication in a HE360 mission involving a cluster of three HE360 satellites. Dkt. 120-9. Historically, HE360 had to downlink its data from each satellite separately. *Id.* It

was interested in exploring potential efficiencies in first relaying the information between satellites, so that the data could then be downlinked to earth in a single transmission. *Id.* In layman's terms, HE360's goal was to use the Blue Cubed terminals to take data from all of the satellites in its cluster and consolidate it into one of the satellites, then transmit it to Earth from there. *Id.* The optical communication terminals were not intended to be used for the downlink of the data, just to collocate it on a single platform. *Id.* HE360 has a separate radio communication system for downlink. *Id.*

Since HE360 purchased the Blue Cubed satellites to facilitate communications between its own satellites, which are "space-borne assets" that are "wholly owned" by HE360, Blue Cubed's license/sales to HE360 falls under the plain language of the exception to Neuron's exclusive license.

Neuron disputes that the exception covers the HE360 sale because (1) the purchase agreement does not specifically describe the use to which HE360 means to put the satellites and (2) HE360, in separate conversations with Neuron, has expressed interest in making optical connections to satellites other than its own. *See* Dkt. No. 138-3 (citing Dkt. No. 116-14, Ex. 33 ("Neuron points to HE360's prior expressions of interest in "downlink" and "low latency backhaul."); Dkt. No. 116-15 (HE360 interest in crosslinks between their own satellites for geolocation, precision time transfer between their satellites, and low-latency backhaul of data products from their satellites); Dkt. No. 139-2 (HE360 interest at Blue Cubed 2023 product briefing in "near term" interest in crosslinking "own terminals," future interest in use for backhaul)).

However, as the party asserting breach of contract, Neuron bears the burden of production on breach. Neuron has put forward no evidence that HE360 intends to use the Blue Cubed satellites other than to form links between its own satellites, as Mr. Haengel testified. Indeed, Mr. Haengel explicitly testified that although in an "ideal world where laser communication systems are proliferated, [HE360] would have had an interest in [transmitting data to other entities] at that time and even today, I would say that technology does not exist on orbit." Dkt. No. 144-6 at 22:17-25. To the extent HE360's separately explored the potential for a broader mesh network,

this interest is not sufficient to raise a genuine dispute of material fact in the absence of evidence that HE360 intends to use the Blue Cubed terminals it purchased for a purpose other than to facilitate communications among its own satellites. Further, even if HE360 did use the terminals for downlink and backhaul, such uses appear to fall outside of Neuron's exclusive license, which only covers LEO communications (between satellites in LEO), not downlinks to Earth. Mr. Husseini testified that the license to Neuron leaves Blue Cubed free to engage in downlink services, if it wishes. *See* Dkt. No. 138-12 at 82:21-83:3 (Blue Cubed free to operate in "LEO to air, LEO to ground, LEO to sea, LEO to MEO, LEO to GEO). And Neuron's counsel clarified at oral argument that Neuron does not contend that LEO to ground backhaul is within its use case.

Blue Cubed's license to HE360 falls within the "wholly owned by said third party licensee" exception. On this point, Blue Cubed's motion for summary judgment is **GRANTED**.

Although the only terminal sale in the record by Blue Cubed is to HE360, the record is clear that Blue Cubed intends to make future similar sales. The parties dispute whether the "an additional third-party licensee" exception provides Blue Cubed with the ability to license to only *one* such third-party or to multiple third-parties. This dispute ties into the parties' larger debate about the meaning of the Communications-as-a-service field of use.

Neuron's license is exclusive "for use in providing Communication-as-a-Service (CaaS) between spacecraft in low Earth Orbit (LEO), where LEO is defined as between 100 and 2000 km of Earth surface. CaaS is defined as a space- borne entity in LEO providing access to any other space-borne entity in LEO for the purpose of transporting data originating from an asset(s) in space that is owned or operated by any third party." The parties' central dispute is whether this exclusivity covers the sale of terminals for optical communication in LEO. If the purpose of the license is to facilitate Neuron's overarching business model of selling a data service rather than selling hardware (i.e. terminals), it could be argued that the license would not prohibit Blue Cubed from selling its terminal (hardware) since it would not compete with the data service Neuron was selling.

The language of the contract is not particularly clear. Although Neuron contends that the "wholly owned by a third-party licensee" exception would not be included if CaaS did not

United States District Court
Northern District of California

encompass the licensing of terminals even for a third-party's own internal communications, the "exception" could also be understood as a clarification of what falls outside of CaaS. Third parties that wholly own their own satellites would not likely need Neuron's data services for their internal communications. On the other hand, if the sales exception were meant to limit sales of terminals to only one third party, that would suggest that Neuron is interested in the sales of terminals and wanted to limit Blue Cube's ability to compete in that regard.

Blue Cubed submits extensive extrinsic evidence that (1) the parties contemplated Blue Cubed would sell terminals at the time they contracted and (2) that Neuron's proposed use case is the provision of a data service, not hardware vending. When the parties signed their memorandum of understanding, Neuron's model was a described as a "data relay service" that could "benefit Blue Cubed" by creating demand for the "requisite OISL subcomponents." Dkt. No. 121-3. Mr. Husseini initially proposed a "quantity limitation" clause, where Blue Cubed could sell up to 50 units with no restriction based on application, and more by consent if "more than 50 is needed by one customer and we deem them non-competitive." Dkt. No. 115-8. This proposal is notable both because it evinces no discomfort with Blue Cubed making low levels of sales even within the LEO communication realm and because Mr. Husseini identifies the customer buying terminals as the potential competitor in the scenario where Blue Cubed sells more than 50 units, not Blue Cubed itself. This suggests that Mr. Husseini's concern with potential sales by Blue Cubed was not direct competition by Blue Cubed, but rather another company making a large enough purchase of Blue Cubed terminals that it could set up a competing network providing communications as a service. When Mr. Husseini revised his proposal, he observed that the low 10% equity that Blue Cubed received as consideration for an exclusive license of its primary IP was justified by the fact that the license would not "place any quantity cap on BlueCubed for manufacturing/selling the box." Dkt. No. 119-55. This communication again appears to contemplate that Blue Cubed might make sales of the "box," i.e., the terminal, within the LEO communications field that it was licensing.

The extrinsic evidence from after the signing of the IP License but before the signing of the Subcontractor License is also probative, since the Subcontractor License ultimately repeated the

Communications-as-a-service use case limitation and the parties collaborated extensively on the DIU pitches that led up to it. An earlier Neuron proposal to DIU emphasized that Neuron would have "pure hosted optical payload architecture" and be an OISL pure-play" without a licensing fee. Translated out of jargon, this means that Neuron's business model was for its terminals to be hosted without a requirement that the hosting entity license them. The model is thus "pure play" because Neuron would not be making revenue through licensing (or sale) of the terminals – only through selling the communications themselves. Dkt. No. 119-9. In a white paper, Neuron analogized its business model to AT&T's commercial dominance through investment in communication lines. The paper stated that Neuron believed "the highest commercial viability lies in the operation of a network, and the offering and coordinating of a service to customers, rather than the sale of individual units" and that "[a] common trap for hardware companies commercializing products with breakthrough performance is ending up as a component vendor." Dkt. No. 119-5. Neuron's model, rather than hardware vending, would be to "charge a fee-per-use" to each customer. *Id.* Neuron continued to make statements along similar lines after the signing of the Subcontractor Agreement. In late 2022, it stated, "Just to clarify, we're not looking to be an OISL vendor like Mynaric or TESAT." Dkt. No. 119-6. The Neuron business model would be to give space companies the units "highly subsidized/free and charge per use." *Id.* Even in 2025, in investor presentations, Neuron continued to represent that its business model was charging per GB of data transport. Dkt. No. 119-8.

This extrinsic evidence suggests that the "Communications as a service" definition involves the provision of terminals as a communications service and that the business model was not focused on the sale of the hardware itself. However, Neuron argues that for optical terminals, the provision of the service and the provision of the hardware facilitating that service are difficult to separate. Neuron contends that to provide its service, it must provide its own hardware, and that Blue Cubed, by selling a competing optical terminal that does not provide Neuron's service, interferes with Neuron's ability to establish its service. If a third-party, like HE360, buys a Blue Cubed terminal, this precludes Neuron from placing its own terminal, and thus generating participation in and revenue for its communications network. Neuron also argues that if Blue

United States District Court
Northern District of California

Cubed can sell as many base terminals as it wants, it could facilitate a competitor to provide CaaS on Blue Cubed terminals. And, as noted above, to the extent the exclusion for sale to a third party is limited to a one-time sale, that would suggest Neuron does have an interest and intended to protect against competition from the sale of hardware (terminals).

Factual disputes thus remain as to whether the Blue Cubed's apparent business model of selling optical terminals for LEO communications competes with or frustrates Neuron's CaaS business model. These factual disputes will also inform the dispute as to whether the IP License grants Blue Cubed the ability to make as many sales to third-parties as it pleases for internal use or only to one such customer.

Blue Cubed's motion for summary judgment is **DENIED.**

2. Notification Breach of the IP License

The IP License states that "Blue Cubed, LLC hereby agrees to notify Neuron of any other proposed licenses to any other third-party licensees of the Blue Cubed IP." Dkt. No. 18-1. Neuron contends that since Blue Cubed did not notify Neuron that it proposed to license its IP to HE360, it breached this provision of the agreement. Blue Cubed concedes that it did not notify Neuron, but maintains it was not required to notify Neuron because the HE360 contract was a sale agreement, not an IP license. However, the HE360 purchase agreement includes the grant of a "worldwide, non-exclusive, written and royalty-free license (including right to sublicense, subject to prior approval by Seller) to use the IP for the sole purpose of using the Products for the production, operation, or sale of Satellites." Dkt. No. 116-1, Ex. 4. Even if the agreement is largely a purchase agreement, it indisputably contains a license, and the provision in the IP License Agreement does not distinguish between kinds of licenses. Blue Cubed's failure to notify Neuron of its proposed license was breach.

Blue Cubed contends that, even if it breached this provision, Neuron fails to identify damages from the breach, such that its claim for breach of contract should be denied as a matter of law. Dkt. No. 134-1 at 16. Blue Cubed relies on evidence that Neuron became aware of the Hawkeye and Blue Cubed purchase agreement soon after it occurred and made no objection. *See*

United States District Court
Northern District of California

Dkt. No. 116-1, Ex. 4 (purchase agreement was signed between HE360 and Blue Cubed on April 16, 2025); Dkt. No. 134-15 (April 24, 2025 email by Neuron's CEO stating that "HE360 will be flying our tech on a 2027 cluster, to be delivered to HE360 by our contractor, Blue Cubed.").

However, as Neuron argues, if Blue Cubed had disclosed the "proposed license" before the contract was signed, rather than as a fate accompli, it could have taken action to "dissuade HE360" or "seek injunctive relief." Dkt. No. 147-3 at 10. There is a difference between learning of a contract before and after it is signed. Whether Neuron was damaged by learning of the deal after it occurred remains a question of fact.

Neuron's motion for partial summary judgment that Blue Cubed breached the notice provision of the IP contract is **GRANTED**. This grant pertains only to the element of breach.

3. Prototype Delivery Under the Subcontractor Agreement

It is undisputed that the Subcontractor Agreement contemplates building three prototype terminals. It is undisputed that Blue Cubed built at least two prototype terminals. The parties move on whether the Subcontractor Agreement required Blue Cubed to deliver these prototype terminals to Neuron as "deliverables," and whether the Subcontractor Agreement vests title to the *hardware* of the three prototype terminals—as opposed to any associated IP—in Neuron.

The only provision of the Subcontractor Agreement that discusses property, as opposed to intellectual property or information, is Article 15. Article 15 provides that: "The Company [Neuron] and/or Government, where applicable, will not take title to Subcontractor acquired or produced property, except property the agreement identifies as deliverable property, unless the parties agree otherwise. Title to all other property shall remain with the Subcontractor." Dkt. No. 4-4. Under Article 15, Blue Cubed retains title to any property not identified in the agreement as a deliverable, unless the parties make a separate agreement. Neuron has presented no evidence on summary judgment that the parties made such an agreement as to the disputed prototypes. While Neuron points to a draft shipping agreement stating that "Title and risk of loss or damage to the goods shall transfer from Blue Cubed to Neuron once the goods are made available at the location named," this agreement was never executed. Dkt. No. 116-11, Ex. 27. Since it was not executed,

it effectuated no legal transfer of title. The question of title thus turns on whether the prototypes were "deliverables" under the contract.

Beyond Article 15, the Subcontractor Agreement itself does not speak further on deliverables, but Section 2.3 of the incorporated Statement of Work ("SoW") is titled "Deliverables." This section states: "Unless stated otherwise, all deliverables under this SoW will be delivered to Neuron. Should NSIC request Neuron rework of any deliverables or request the inclusion of additional content, Blue Cubed will make a reasonable effort to provide additional technical details as necessary. All reports are in slide format unless specified otherwise, or requested by NSIC . . . The deliverables associated with this SOW include the following: . . ." The portion of the contract detailing the deliverables spans three pages and lists 11 phases of prototype building and testing with associated deliverables. Deliverables are underlined in each paragraph. For example, Phase 10 provides:

> 2.3.10 Phase 10: Final Reports
>
> - Blue Cubed will collaborate with Hood Tech towards integrating a matured optical payload onto each of the three flight unit gimbals, producing three flight-ready lasercom terminals. Blue Cubed will facilitate access to qualification facilities, and a joint team from Blue Cubed and Neuron will put each unit through thermal, vacuum and vibration testing for acceptance. Blue Cubed will deliver the Flight Unit Acceptance Report, in slide format. Blue Cubed will deliver an updated System Architecture Document, providing institutional knowledge on how to install the lasercom terminal on a spacecraft.
> - [CA + 12 month]

The deliverables mentioned throughout the SoW include reports, quad-charts, slides, and documents. None of the underlined deliverables are hardware. The deliverables section is followed by Section 3, Delivery Schedule. This section of the SoW is a chart with columns including each "Deliverable," the date upon which the deliverable is due, and the delivery method. The Deliverables identified in this chart align with the underlined deliverables in the prior section. Again, no hardware is included. The delivery method for each deliverable is listed as email.

United States District Court
Northern District of California

**3. Delivery Schedule**

| Paragraph Reference | Deliverable | Frequency | Due Date | Delivery Method | Technical Requirement Reference | Associated Data Rights[1] |
|---|---|---|---|---|---|---|
| 3.0 | Monthly Status Report | Recurring | First half of each month, prior to scheduled meeting | Acceptance via e-mail by PM | 2.3 | As described in the Agreement |
| 3.1 | System Architecture Document, | Once | CA + 0.5 month | Acceptance via e-mail by AOR | 2.3.1 | As described |

Under the express terms of the contract, the three prototype terminals do not appear to be "deliverables." Deliverables are explicitly identified in the Statement of Work (SoW), both through underlining in the Deliverables section and through inclusion in the Deliverable column of the chart in the Delivery Schedule section. The terminal prototypes themselves are never listed as deliverables; indeed, none of the deliverables are hardware. Instead, the deliverables are defined as reports, slides, documents, etc.

Neuron points to language in the SoW that "NSIC [National Security Innovation Capital, a component of the DIU] will specifically provide $3M to Neuron to design, develop, test and deliver three (3) prototype lasercom terminals," but this language does not necessarily demonstrate that the prototypes are Blue Cubed deliverables. To the extent this language describes a prototype delivery obligation, the obligation it describes belongs to Neuron, not Blue Cubed. Blue Cubed's deliverable obligations as a subcontractor are explicitly enumerated in the SoW and do not list the prototypes. On the other hand, an inference might be drawn that given its obligations to the DIU, it was Neuron's expectation that Blue Cubed would provide as deliverables to Neuron actual prototypes. This inference, however, does not appear to be supported by the language of the contract as noted above.

There is also extrinsic evidence suggesting that the parties did not expect the prototypes to end up in the Government's physical custody. Mr. Husseini testified that he understood the Government to not expect the physical delivery of hardware. *See* Dkt. No. 119-15, Ex. 24 ("DIU never asked to keep the hardware. DIU expected the hardware to be developed and to stay with the vendor. . . You deliver it to DIU, but then they let you keep it."); *see also* Dkt. No. 134-14, Ex. 23

(NSIC representative stating in response to Neuron post-litigation query that "[a]ny completed prototypes can remain in the hands of the vendor, unless there was an explicit stipulation in the contract to the contrary"). To be sure, Neuron raises post-litigation correspondence with the Government in which the Government's representative states that "We expect that Blue Cubed provide all three terminal builds to Neuron in a timely manner in order to address the associated deliverables" and that "It is NSIC's expectation that Blue Cubed should still deliver those two remining [sic] units to Neuron, so Neuron can then meet its delivery obligations to NSIC, per the SOW, even if on a delayed schedule." Dkt. No. 115-13, Ex. 17. However, such post-hoc evidence of expectations, which were explicitly solicited by Neuron for this litigation, is deserving of only limited, albeit some weight. However, the position solicited by Neuron from the DIU appears to be somewhat inconsistent with Neuron's summary judgment position that "[w]ithout flight ready prototypes, Neuron has nothing to fly and nothing to show, and therefore cannot sign customers, entice a mega-constellation partner, or obtain venture funding." Dkt. No. 115-2 at 11. If Neuron were obligated to deliver the prototypes to the DIU, it might not be able to do those things on its own. Neuron's current litigation position thus also contemplates that it will end up in possession of the prototypes for its own uses, not for delivery to the Government as part of a contractual obligation. In any event, these extrinsic facts are not dispositive of whether Neuron was entitled to the prototypes from Blue Cubed as deliverables

Thought the terms of the contract suggests deliverables do not include the actual prototypes, if extrinsic evidence reveals that apparently clear language in the contract is, in fact, "susceptible to more than one reasonable interpretation," then extrinsic evidence may be used to determine the contracting parties' objective intent." *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co*., 69 Cal.2d 33, 39–40 (1968).

Neuron points to internal Blue Cubed communications, some of which discuss the terminals as deliverables. *See* Dkt. No. 116-6 Ex. 20 ("I need to give this some more thought and parse what we are required to share under the DIU contract. I believe we are contract to deliver three terminals and not any design details."); Dkt. No. 115-15, Ex. 23 ("Our current priority is to meet the hardware deliverables of the DIU contract, we will pivot to software development . . .");

Dkt. No. 115-16, Ex. 24 ("I believe they [Neuron] are messaging to Harry [DIU] that we could have hardware ready for delivery by the end of the year"); Dkt. No. 116-9, Ex. 25 ("The plan is to have a system assembled and into test later this year with delivery of three flight units in April next year.); Dkt. No. 116-10, Ex. 26 ("My hope is to have the hardware back in Colorado in two weeks so we can build up the second flight unit and check off all of the DIU hardware deliverables by the end of April"); *but see* Dkt. No. 116-7 Ex. 21 ("[T]here is nothing in the contract about hardware delivery expectations and who pays"). In one January 2023 conversation, the Blue Cubed founders discuss what work they can bill to the DIU contract. Dr. Kingbury states that his MO has been to "only bill to DIU when the hours were in direct support of one of our deliverables. Things like the radiometry test bed work are in support of Cobalt, but aren't directly attributable to one of the DIU deliverables." Dr. Palo responds, "Our deliverable to DIU is three units so I would argue anything required to meet that deliverable even it not directly identified as a milestone is billable to the DIU project." Dkt. No. 116-5, Ex. 19. These documents suggest that at least some of Blue Cubed's founders understood the prototypes to be "deliverables" under the contract.

The extrinsic evidence presented by Neuron on this issue is not conclusive, but it does not need to be. The question is whether it demonstrates that the meaning of deliverables is "susceptible to more than one reasonable interpretation." *Pacific Gas,* 69 Cal.2d at 39–40. Under this standard, the Court finds the extrinsic evidence sufficient to demonstrate that more than one reasonable interpretation exists. Neuron's interpretation also accords with common sense. Neuron planned to make and mass produce the terminals developed under the DIU contract as an essential part of creating its communication network. Even if the reports and other deliverables from the SoW contained all of the technical information needed for Neuron to build the terminal, having a built terminal on hand would inarguably aid this effort. It is not unreasonable to assume the parties contemplated Neuron receiving the finished terminal, not just the technical documents that describe it.

Because the Court finds that construction of the contract here requires examination of the extrinsic evidence, and that extrinsic evidence presents genuine disputes of fact, Neuron's motion

for summary judgment against Blue Cubed for breach of the subcontractor agreement for failure to deliver the terminal prototypes is **DENIED**. Blue Cubed's motion for the same is also **DENIED**.

4. Subcontractor Cross License under the Subcontractor Agreement

Neuron seeks summary judgment on whether the Subcontractor Agreement contains a present cross license to Blue Cubed or, as Neuron contends, merely a promise to negotiate a cross license. For this contractual dispute, neither party relies on extrinsic evidence, meaning that the determination is fully a question of law based on construction of the agreement. The relevant section of the Subcontractor Agreement states at 9.1.2 (emphasis added):

> The Company [Neuron] agrees that Subcontractor [Blue Cubed] has existing IP being used for the execution of their obligations under this Agreement. The Company agrees that any and all improvements made to Subcontractor's IP (inventions, copyrights, trade secrets, derivative works, source code and any other proprietary information, confidential information, designs, data or know how, etc.) ***shall remain*** property of Subcontractor. Subcontractor agrees that IP related to the optics/gimbal interface effort (inventions, copyrights, trade secrets, derivative works, source code and any other proprietary information, confidential information, designs, data or know how, etc.) developed under this Agreement ***shall be property*** of the Company, subject to limitations due to Company's obligations to any third party regarding the IP related to the optics/gimbal interface effort. Both Parties agree that any IP generated under this Agreement ***shall be licensed*** to the other Party, subject to limitations due to Company's obligations to any third party regarding the IP related to the optics/gimbal interface effort**.** Subcontractor hereby agrees to immediately deliver all Company owned intellectual property to Company upon termination of this Agreement or upon any such request or notice by Company.
>
> Subcontractor hereby agrees to ensure all of subcontractor's employees and contractors are bound by a duty to assign such intellectual property rights to Company. Subcontractor hereby agrees and warrants that such intellectual property will not be disclosed to any third-party projects or products without Company's prior written approval. Subcontractor hereby agrees subcontractor has a duty to Company to take all actions to identify, protect and secure the intellectual property in a timely manner, as if such intellectual property were owned by subcontractor. Company agrees to pay Subcontractor for time spent in perfecting Company IP under this Agreement at Subcontractor's current market billing rate.

Neuron argues that the "shall be" language proceeding the cross license grant constitutes "a future agreement to assign" rather being declarative of present assignment, citing to *Omni*



United States District Court
Northern District of California

*MedSci, Inc. v. Apple Inc.*, 7 F.4th 1148 (Fed. Cir. 2021), a patent assignment case. However, as *Omni* itself notes "the identical phrase in two paragraphs of a provision of a contract should be read identically." *Id.* at 1152-1153. The provision here uses "shall be" language to refer both the cross license and to the initial license of IP under the agreement to Neuron. Following Neuron's argument, its own license to the IP being developed under the agreement would be nothing more than a promise of the IP to assign to Neuron; Neuron would have no present property rights in the IP from a contract it arranged and that it is suing in this action to enforce. It is difficult to believe that the parties (including Neuron) contemplated such a result. Neuron must have assumed that "shall" as used in the agreement had present effect without further action.

Moreover, while the IP rights assigned by this provision are not elaborated on in much depth, the other provisions of the contract contain limitations on the IP rights assigned. Neuron's cross license is subject to a use-case limitation. *See* Dkt. No. 4-4 ("Nothing in this agreement shall confer to [Neuron] a license to use any software, copyrighted material, data, or hardware generated under this Agreement for purposes outside of the licensed use case of Communication-as-a-Service (CaaS) market."). And Blue Cubed's cross license is subject to a disclosure limitation. *See id.* (Blue Cubed may not "disclose[ the IP] to any third-party projects or products without [Neuron]'s prior written approval,"). The identification of these detailed limitations supports the conclusion that a present assignment (and not a mere future promise) was made in the agreement.

*Omni*, which concerned whether university bylaws effected a present automatic assignment of its employee's patent rights, is distinguishable. 7 F.4th 1148, 1152. At issue were standing university bylaws stating that that patents issued based on research supported by University funding "shall be the property of the University." The bylaws were general and did not reflect a negotiation between two parties about specific IP, as did the contract here. The context of the agreement here supports that a present assignment, rather than a promise to assign, was intended both for Neuron's IP license and for the parties' cross licenses.

Neuron's motion for summary judgment that the Subcontractor Agreement contained only a promise to cross-license, rather than the existence of a present cross license, is **DENIED**.

United States District Court
Northern District of California

5. Subcontractor Agreement Written Approval Provision

The parties seek summary judgment on whether Blue Cubed breached the Subcontractor agreement by failing to obtain Neuron's prior written approval for the HawkEye360 deal. The relevant portion of the IP agreement is again Section 9.1.2 (emphasis added):

> The Company agrees that Subcontractor has existing IP being used for the execution of their obligations under this Agreement. The Company agrees that any and all improvements made to Subcontractor's IP (inventions, copyrights, trade secrets, derivative works, source code and any other proprietary information, confidential information, designs, data or know how, etc.) shall remain property of Subcontractor. Subcontractor agrees that IP related to the optics/gimbal interface effort (inventions, copyrights, trade secrets, derivative works, source code and any other proprietary information, confidential information, designs, data or know how, etc.) developed under this Agreement shall be property of the Company, subject to limitations due to Company's obligations to any third party regarding the IP related to the optics/gimbal interface effort. Both Parties agree that any IP generated under this Agreement shall be licensed to the other Party, subject to limitations due to Company's obligations to any third party regarding the IP related to the optics/gimbal interface effort. Subcontractor hereby agrees to immediately deliver all Company owned intellectual property to Company upon termination of this Agreement or upon any such request or notice by Company.
>
> Subcontractor hereby agrees to ensure all of subcontractor's employees and contractors are bound by a duty to assign such intellectual property rights to Company. **Subcontractor hereby agrees and warrants that such intellectual property will not be disclosed to any third-party projects or products without Company's prior written approval.** Subcontractor hereby agrees subcontractor has a duty to Company to take all actions to identify, protect and secure the intellectual property in a timely manner, as if such intellectual property were owned by subcontractor. Company agrees to pay Subcontractor for time spent in perfecting Company IP under this Agreement at Subcontractor's current market billing rate.

The question is whether Blue Cubed's sale agreement with HawkEye360 was disclosure of Neuron-owned intellectual property to a "third-party project[] or product[]." Blue Cubed appears to concede that its sale to HawkEye discloses Neuron IP, at least for the purpose of summary judgment. *See* Dkt. No. 134-1 at 15-16 (Blue Cubed not disputing disclosure itself). Blue Cubed instead disputes that the Hawkeye deal constitutes a "disclosure to any *third-party project or product*." Blue Cubed contends that this phrase means "work with a separate third party (*e.g.*, the development of other technology with a new partner), rather than the mere sale of an OCT to a

customer." Dkt. No. 134-1 at 15. Neuron maintains that "HE360 is clearly a third-party and the terminals developed under the DIU project sold by Blue Cubed and satellites on which HE360 intends to install them are clearly 'projects or products.'" Dkt. No. 147-3 at 8.

Any interpretation of this clause needs to give meaning to all of its terms. The disclosure here must be "to" a third-party "project or product." It is hard to see how Blue Cubed's terminal sales are *to* a third-party *product*. Although Neuron contends that the terminals being sold to HE360 are "products," they are not clearly *third-party* products, since the terminals are Blue Cubed's, not HE360's. Nor is the Neuron IP being disclosed *to* the product (the Blue Cubed terminals), since the terminals encompass the IP.

Whether Blue Cubed's sale of the terminals to HE360 counts as a disclosure to a third-party "project" is a closer issue. Merriam-Webster defines a project as a "specific plan or design," or a "planned undertaking." https://www.merriam-webster.com/dictionary/project. The HE30 representative who handled the Blue Cube purchase agreement testified that the terminals were to be used for a particular HE360 space "mission," to facilitate communications between HE360's satellite cluster, which could be considered a kind of planned undertaking. Dkt. No. 120-9, Ex. 62. But the purchase agreement itself simply describes HE360 as buying the terminals for its own "use." Dkt. No. 116-1, Ex. 4 (describing purchase of the products "for use in Purchaser's constellation of Satellites").

While the contractual language here is ambiguous enough that the consideration of extrinsic evidence would be warranted, neither party has pointed to extrinsic evidence that moves the needle in either direction. No extrinsic evidence has been identified relating to this specific provision. Instead, the parties rely on their larger arguments about the parties' business intentions, as discussed above.

The Court finds that this contractual question is tied to these larger disputes regarding the parties' business intentions, which cannot be resolved on summary judgment. Both parties' motions for summary judgment on this provision are **DENIED**.

**B. Neuron's Claims for Trade Secret Misappropriation**

To prevail on a claim under the federal Defend Trade Secrets Act ("DTSA"), the plaintiff must prove: "(1) that the plaintiff possessed a trade secret[;] (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *Chung v. Intellectsoft Grp. Corp.*, 2024 WL 813445, at *6 (N.D. Cal. Feb. 12, 2024). A trade secret requires three elements: "(1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) (citing 18 U.S.C. §§ 1839(3), (5)). "If information is publicly available or widely known in a given industry, it is not a trade secret." *Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1013 (N.D. Cal. 2018), aff'd, 815 F. App'x 117 (9th Cir. 2020).

Although Neuron asserted broad categories of trade secret in its Complaint, its expert, Dr. Lebby, states that Neuron has focused its allegations on trade secrets reflected in three sets of documents, described as: (1) Internal Configuration of Components (Photo); (2) Design and Material of Telescope Component (Photos); and (3) Interface Control Details (Document). Dkt. No. 119-47 at 115-135. Neuron does not argue in its opposition that it asserts trade secrets other than the ones identified in its expert report, so the Court may take this list as definitive. Blue Cubed contends that Neuron's asserted trade secrets #1 and #2 were not subject to reasonable protective measures, #2 does not have independent economic value, and that as to trade secret #3, disclosure was harmless.

<u>Trade Secret #1</u>

TS #1 is the form factor and placement of particular components as reflected in an internal photo of the terminal included in a Blue Cubed 2025 marketing brochure. Dkt. No. 119-47 ¶115; *see* Dkt. No. 18-16.

According to Dr. Lebby, the image in question "discloses the form factor and placement of components in the payload, including the electronics board stack and the telescope design. It also shows where the star tracker and other components are located on the device, how they are placed,

and how they have been made to fit together. More specifically, the photo discloses the integrated form factor and placement of the PCB and stacked electronics packaging." Dkt. No. 119-47 at 117. She opines based on a call with Neuron employee that "most competitive systems maintain a separate electronics box that are coupled with an umbilical, while Neuron's Node is self-contained and the way the stacking of the boards and packaging is placed is unique." *Id.* "[E]ven if one knows the outer dimensions of the "box" in which you want to fit these components, it is not obvious how best one might do that." *Id.*

<u>Trade Secret #2</u>

TS #2 is the design and construction of the afocal telescope component and the selection of material used in that component, as reflected in photographs published by Exact Engineering, a Blue Cubed subcontractor. *Id.* at 123.



The top two photos show the entire component design. From left to right on the second row: the telescope horizontal tube, telescope fold mirror, and telescope vertical tube

subcomponents of the telescope design. *Id.* at 125. According to Dr. Lebby, the material of the telescope was designed to be "athermal—meaning, that performance does not change over the anticipated temperature ranges of a launch into LEO." *Id.* at 127. "This was a critical design factor to the Node that simplified the design and did not require an actively controlled component to handle changes over temperature." *Id.* Dr. Lebby's report does not state what the material is, though she states that "a non-expert in the field could get information about the use case, materials and coating" from using any reverse-image search engine. *Id.* at 128.

<u>Trade Secret #3</u>

This trade secret is "the details of the integration of the payload with the gimbal, including the interface controls, wiring, and communications as contained in the Interface Control Document (ICD) that was created by Blue Cubed under the Subcontractor Agreement."

1. **No Independent Value (TS #2)**

To be protected as a trade secret, something must be "valuable because it is unknown to others." *InteliClear*, 978 F.3d at 657 (9th Cir. 2020) (citing 18 U.S.C. §§ 1839(3), (5)). "If information is publicly available or widely known in a given industry, it is not a trade secret." *Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1013 (N.D. Cal. 2018), *aff'd*, 815 F. App'x 117 (9th Cir. 2020). Neuron has the burden of proving that its asserted trade secrets have value from being unknown. *See Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 465-66 (9th Cir. 1990).

Blue Cubed challenges this element as to TS #2, the folded telescope, in so far as Neuron alleges that external photos and renderings of the telescope are themselves protected as trade secrets.

<u>Blue Cubed's Evidence</u>

Blue Cubed submits an expert rebuttal report from Michael Butterfield stating that the telescope photographs "show the external folded form factor, but they do not disclose the internal

United States District Court
Northern District of California

optical design, including lens positions, lens curvatures, lens spacing, glass selections, filter placement, tolerances, or internal optomechanical features." Dkt. No. 120-10. He states that "Folded optical paths are a conventional packaging technique where space and weight constraints matter, and public optical-design literature treats them as such. A folded path is a packaging topology, not an optical prescription. Knowing that an optical train is folded does not identify the prescription, tolerances, athermalization method, stray-light design, coatings, or alignment procedure. It is my opinion that folded optical path telescopes are a well-known technique to anyone skilled in this field. Indeed, Blue Cubed had a folded telescope prototype long before the DIU project had begun." *Id.* He further disagrees that "the photograph meaningfully reveals the athermal design. Athermalization is a known optomechanical design technique, and it depends on lens materials, housing expansion, optical power, temperature behavior, and mechanical spacing. The external photograph does not reveal lens coefficients of thermal expansion, glass selections, internal spacings, the specific housing alloy, or the thermal compensation strategy." *Id.* Dr. Butterfield also notes that while Dr. Lebby asserts that a visual inspection would allow even a non-expert to determine what material to use, Dr. Lebby does not himself "identify the specific metal alloy, coating system, lens materials, or lens thermal properties needed to reproduce the athermal behavior he describes. At most, the photograph suggests a general class of machined and finished metal components. It does not disclose the specific material properties or internal optical design needed to copy the telescope." *Id.*

Blue Cubed also submits an article titled "Optical Design at APL," published in 1988. The article discusses design considerations for optical systems. It states that "optical systems developed for missile and space applications require high performance and lightweight, compact packaging." Dkt. No. 121-73. It explains that the "first task" of the optical designer is to select the "basic design" needed. According to the article, "space and weight constraints may require a folded optical path or an even more unusual design" and that the "compact, folded nature of reflecting telescopes makes them especially attractive for space missions." *Id.* at p.319.

<u>Neuron's Evidence</u>

Neuron relies exclusively on the expert report of its expert Dr. Lebby. Dkt. No. 138-14. Dr. Lebby states that the photos show the "entire component design," "the inclusion of the paperclip makes obvious the size thereof," that the "folded nature of the optical path is a key aspect of the design," and that the "design effort took more than 7 months." Dr. Lebby further states that the designers "managed to squeeze all operational components into a very tight space that makes this terminal very attractive to many small sat customers." Dr. Lebby also states that "the material choice is important as this telescope was designed to be athermal—meaning, that performance does not change over the anticipated temperature ranges of a launch into LEO," that this was a "critical design factor," and that the photos allow a skilled or unskilled individual to "get information about the use case, materials and coating," and "establish the material choice with reasonable certainty or testing." Dr. Lebby concludes that this information would allow a "fast follower with reasonable skills" to develop the telescope in "significantly less time than it took for the initial design."

<u>Discussion</u>

Neuron does not meet its burden to show that the photographs of the telescope exterior disclose trade secrets. First, there is undisputed evidence that a folded telescope design is widely known in the industry specifically for space applications. Blue Cubed submits an article from *1988* explaining that "space and weight constraints may require a folded optical path or an even more unusual design" for a telescope and that the "compact, folded nature of reflecting telescopes makes them especially attractive for space missions." Dkt. No. 121-73. Neuron attempts to argue that the images disclose more specific information about subcomponents and sizing based on the fact that a reference paperclip is included in the imaging. But paperclips come in multiple sizes, and it defies common sense that one could obtain detailed measurements of a complex curved telescope simply from a free-floating paperclip's inclusion in the image.

Second, Neuron's position that the photographs disclose valuable information about the material of the telescope is unsupported. Its expert's testimony establishes that the value of the

material for this telescope is its athermal nature. But athermality is a property various materials may have, *e.g.*, the property of not responding to extreme temperature shifts. The Court does not credit Dr. Lebby's conclusory assertion that the exact material can be gleaned simply from looking at these images. *C.f. Stabile v. Paul Smith Ltd.*, 137 F. Supp. 3d 1173, 1189 (C.D. Cal. 2015) (courts routinely discount conclusory expert conclusions on substantial similarity, which involves a layman making visual determinations). At most the images show some kind of metallic substance. They do not disclose the exact material used in the telescope, or its athermic properties. Neuron does not explain *how* the exact material can be gleaned just from these photographs.

Finally, Neuron relies on the fact that the telescope took "7 months and hundreds of thousands of dollars" to design. But as the article submitted by Blue Cubed explains, selecting the basic design of the telescope is only the "first task" in designing it. The remainder of the task is to design the actual optics. As Blue Cubed's expert points out, the exterior images do not "disclose the internal optical design, including lens positions, lens curvatures, lens spacing, glass selections, filter placement, tolerances, or internal optomechanical features." Dkt. No. 120-10. Given all the aspects of designing the telescope not disclosed by external images of its form factor, Neuron's reliance on the overall design time and cost is misplaced.

Neuron has not carried its burden to produce evidence that images of the exterior form factor of the telescope have independent value as a trade secret. Blue Cubed's motion for summary judgment is **GRANTED** as to TS #2.[1]

**2. Lack of Reasonable Protective Measures (TS #1)**

"If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002, 104 S. Ct. 2862, 81 L. Ed. 2d 815 (1984). Accordingly, courts have held that "[i]nformation that an individual discloses to

[1] Blue Cubed also contends that Neuron failed to use reasonable protective measures to protect TS #2, as discussed in the following section for TS #1.

others who are under no obligation to protect its confidentiality" does not qualify for trade secret protection. *Moreland Apts. Assocs. v. LP Equity LLC*, 2019 U.S. Dist. LEXIS 214591, 2019 WL 6771792, at *3 (N.D. Cal. Dec. 12, 2019) (quoting *Nextdoor.com, Inc. v. Abhyanker*, 2014 U.S. Dist. LEXIS 56702, 2014 WL 1648473, at *4 (N.D. Cal. Apr. 23, 2014)). "A disclosure need not be widespread to defeat trade secret protection; it is defeated if no reasonable effort was made to maintain secrecy." *Id.*

However, "[p]roviding alleged trade secrets to third parties does not undermine a trade - secret claim, so long as the information was provided on an understanding of confidentiality." *VBS Distribution, Inc. v. Nutrivita Lab'ys, Inc.*, 811 F. App'x 1005, 1009 (9th Cir. 2020); *see also United States v. Chung*, 659 F.3d 815, 825-26 (9th Cir. 2011) ("oral and written understandings of confidentiality" can qualify as "reasonable measures" to keep information confidential). The Ninth Circuit has declined to affirm summary judgment on lack of protective measures even where the plaintiff disclosed to a third-party with confidentiality agreements, because there were at least "implicit business expectations that [defendant] would keep the prototype secret." *Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1070-71 (9th Cir. 2016); *see also Hilderman v. Enea TekSci, Inc.,* 551 F. Supp. 2d 1183, 1201 (S.D. Cal. 2008) (denying summary judgment because "lack of confidentiality agreements is not dispositive on the issue of secrecy" because plaintiff "may have taken other precautions to keep its information secret"); *Bal Seal Eng'g, Inc. v. Nelson Prods.*, 2018 U.S. Dist. LEXIS 220501, 2018 WL 4697255, at *5-6 (C.D. Cal. Aug. 3, 2018) (denying summary judgment on "reasonable efforts" notwithstanding lack of NDA with every customer to whom trade secrets were disclosed because plaintiff "may take other precautions to keep its information secret, such as verbally telling its clients that the information was confidential or limiting access to information on a 'need to know' basis").

When a party asserting trade secrets has disclosed those secrets to a third-party, "courts will consider the factual circumstances of each case on an individual basis, to determine whether a confidential relationship may reasonably be implied" such that an entity has the duty to maintain the secrecy of confidential information. *Pachmayr Gun Works, Inc. v. Olin Mathieson Chem. Corp.*, 502 F.2d 802 (9th Cir. 1974). "Where the facts show that a disclosure is made in order to

further a particular relationship, a relationship of confidence may be implied, e.g., disclosure to a prospective purchaser to enable him to appraise the value of the secret, disclosure to a prospective lender to assure him of the prospects of a borrower's business, disclosure to agent, partner, or joint adventurer." *Direct Techs., Ltd. Liab. Co. v. Elec. Arts, Inc.*, 836 F.3d 1059, 1070 (9th Cir. 2016); *see also Cedars Sinai Med. Ctr. v. Quest Diagnostic Inc.*, No. 17-cv-5169, 2019 WL 12521480, at *9 (C.D. Cal. Aug. 9, 2019) (finding material dispute as to whether plaintiff made reasonable efforts to preserve secrecy of manuscript by submitting it to journals without any confidentiality agreement because "[t]here is evidence in the record that confidentiality is an understood part of the journal submission process.").

<u>Blue Cubed's Evidence</u>

Blue Cubed proffers evidence that Neuron shared PowerPoint presentations with a slide containing a more detailed photograph of the terminal's interior than Blue Cubed shared, with multiple potential venture capital investors and business partners. *See* Dkt. Nos. 119-25-31, Exs. 40-46. It is undisputed that Neuron did not have NDAs with all of these vendors. *See* Dkt. No. 138-3 (Neuron Opp. at 6). While Neuron had ongoing relationships with some of these third-parties, Neuron did not dispute that several were "cold" emails to investors with whom Neuron had no pre-existing business relationship. *See* Dkt. No. 144-3. In one instance, Neuron's CEO Mr. Husseini wrote that the third-party should "feel free to share" the slide deck. *See* Dkt. No. 119-27, Ex. 42. At least one of the third-parties that Neuron sent its materials to shared the slides. *See* Dkt. No. 120-11, Ex. 70 at 252:3-8.

Blue Cubed submits expert testimony that "[i]n the ordinary course, absent an NDA or other express confidentiality agreement, venture capital firms generally do not treat information contained in pitch decks as confidential in the same manner that a company might treat internal proprietary or trade secret information." Dkt. No. 121-68, Ex. 69 at ¶ 7. "For that reason, founders and companies seeking venture investment are commonly advised not to include highly sensitive, proprietary, or trade secret information in initial pitch decks unless appropriate confidentiality protections are in place." *Id.*

United States District Court
Northern District of California

Neuron Evidence

Neuron points to protective measures it takes to protect its trade secrets, including labeling the slide decks at issue Confidential & Proprietary. *See e.g.*, Dkt. No. 28-3 ("© 2021 Neuron Space Corporation – Confidential & Proprietary"), Dkt. No. 28-8 ("Proprietary & Confidential"), 28-9/115-10 ("Proprietary and Confidential"), Dkt. No. 115-9 ("(c) 2021 Neuron Space Corporation – Confidential & Proprietary"). Neuron states that it has a practice of requiring NDAs with actual and potential employees, advisors, partners, and customers. *See e.g.*, Dkt. No. 138-5, Ex. B (NDAs with actual/potential employees); Dkt. No. 138-6, Ex. C (NDAs with advisors); Dkt. No. 138-7, Ex. D (NDAs with actual/potential partners); Dkt. No. 138-8, Ex. E (NDAs with actual/potential customers); Dkt. No. 138-9 Ex. F ("let's get an NDA in place so we can show you the good stuff.").

Neuron concedes that it does not use NDAs with VCs but submits testimony from Neuron employees that the common practice in the industry is for venture capital firms to not sign venture capital firms do not sign NDAs with startups "before reviewing initial pitch decks or similar fundraising materials." *See* Dkt. No. 138-12 at 309:7-8 (Mr. Husseini testifying that "If you try to ask for an NDA from a VC you'll get laughed out of the room."); Dkt. No. 138-13 Ex. K at 30:1-11 ("[T]o the best of my understanding, it is unusual to have a venture capitalist sign an NDA, but there is absolutely an expectation of confidentiality for anything that is shared"). Mr. Husseini also offers testimony that "conversations with investors have an implicit expectation of confidentiality." Dkt. No. 138-12 at 310:20-23. He testified that when he wrote "feel free to share" with one potential investor, he meant that he was "seeking to be put in front of any funds he worked with" because the individual was a "venture partner with several funds" and "dual-hatted as government and VC". Dkt. No.138-12 at 309:13-18.

Neuron submits expert testimony from Dr. Lebby that that the reason venture capital firms do not sign NDAs "is structural, not adversarial." Dkt. No. 138-11, Ex. L at ¶ 39. He explains: [T]he reason early-stage VCs generally do not sign NDAs is structural, not adversarial. A pre-seed or seed partner sees hundreds of pitches a year across overlapping industries and themes. If every deck created an enforceable set of obligations, the firm would be paralyzed. But that does not

mean that VCs are distributing decks—especially those labeled "Confidential & Proprietary"—outside their VC firm, much less making them public online, using social media, blogging on LinkedIn, or speaking at industry conferences. *Id.* Dr. Lebby has "experience working in venture capital and corporate private equity from [his] time at Intel" and "considerable experience interfacing with the venture capital industry." *Id.* ¶ 38. He opines that "Based on that experience and my knowledge of the industry, I would not expect VCs to convey any confidential information outside of their firm, especially given that Neuron marked the slide deck confidential. If they did, it would potentially jeopardize their credibility and position in the industry. I further understand that Neuron shared this information in a limited manner, primarily with reputable VCs who were introduced through trusted intermediaries, including U.S. government representatives, advisors, founders or friends. These disclosures were therefore not broad distributions, but instead occurred as part of targeted, relationship-driven discussions with specific well-known investors. Under these circumstances, Neuron reasonably expected that the information at issue would be treated as confidential and would not be publicly disseminated." *Id.*

Discussion

The core dispute here is whether Neuron's disclosure of the terminal cross-sections to third-party VCs extinguished its trade secret rights in this information. As an initial matter, although Neuron argues that the images on its investor slide decks were small, they at minimum disclose the same (if not far more) information than the comparable Blue Cubed disclosure. If Neuron shared these slides with individuals under no confidentiality obligation, it cannot claim a trade secret protection for the images contained in those slides.

However, under Ninth Circuit law, Neuron has established a material dispute of fact as to whether it took reasonable protective measures as to these third parties. Although Neuron lacked NDAs or explicit confidentiality agreements with all of these parties, the Ninth Circuit has held that a lack of NDAs is not dispositive, and that "implicit business expectations" that the third-party would keep the disclosed information secret was sufficient to survive summary judgment. *See Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1070-71 (9th Cir. 2016). Neuron

United States District Court
Northern District of California

proffers evidence of such implicit business expectations. Mr. Husseini testified that "conversations with investors have an implicit expectation of confidentiality." Dkt. No. 138-12 at 310:20-23. Neuron's expert Dr. Lebby testified that based on his industry experience he "would not expect VCs to convey any confidential information outside of their firm, especially given that Neuron marked the slide deck confidential. If they did, it would potentially jeopardize their credibility and position in the industry." Dkt. No. 138-11, Ex. L at ¶ 39.

Blue Cubed does present contrary evidence. Its industry expert testified that "venture capital firms generally do not treat information contained in pitch decks as confidential in the same manner that a company might treat internal proprietary or trade secret information." Dkt. No.121-68, Ex. 69 at ¶ 7. Blue Cubed also presents evidence that despite Neuron's claims of implicit confidentiality, at least one VC did in fact share the pitch deck outside of their VC firm. Dkt. No. 120-11, Ex. 70 at 252:3-8.

But this contrary testimony only emphasizes that there is a genuine dispute of fact as to how the venture capital industry treats confidential pitch decks and whether a company's disclosure of trade secrets in a VC pitch deck—without any explicit guarantee of confidentiality—constitutes reasonable protection of those trade secrets.

Because Neuron demonstrates a material dispute of fact, Blue Cubed's motion for summary judgment is **DENIED** as to TS #1.[2]

### 3. Lack of Disclosure or Harm (TS #3)

This claim concerns "the Interface Control Document," which contains "the details of the integration of the payload with the gimbal, including the interface controls, wiring, and communications." Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret ... by improper means; or (B) disclosure or use of [the] trade secret...." 18 U.S.C. § 1839(5). Here, Neuron asserts misappropriation through disclosure.

Blue Cubed does not dispute that it provided the document in question to third parties but

[2] Because at least one trade secret claim from Neuron survives, Neuron has a tether for its UCL claim. Blue Cubed's summary judgment as to Neuron's UCL claim is therefore **DENIED**.

United States District Court
Northern District of California

argues that because it only disclosed TS #3 to a customer under an NDA, there was no disclosure. Blue Cubed also argues that Neuron has not shown damages. As to disclosure, Blue Cubed provided the interface document, which allegedly contains Neuron trade secrets, to a third-party without Neuron's authorization. This appears to be a disclosure under the DTSA; Blue Cubed presents no case law suggesting that the use of an NDA cures the disclosure as a matter of law. Even if the use of protective measures by a party making unauthorized disclosure of a trade secret could cure the disclosure, whether Blue Cubed's protective measures here were sufficient would at minimum be a question of fact. As to damages, while the use of an NDA might mitigate damage from unauthorized disclosure since the information presumably will not be further disseminated, any actual damage from the disclosure and its magnitude is a question of fact that Neuron will have the burden to prove at trial.

Blue Cubed's motion for summary judgment as to TS #3 is **DENIED**.

### C. Tortious interference

Blue Cubed moves for summary judgment on Neuron's claim for tortious interference. Neuron asserts that Blue Cubed's sale of terminals to HawkEye constituted tortious interference with Neuron's potential business partner. To state a claim for tortious interference with prospective economic advantage under California law, a plaintiff must allege "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153(2003). There is a "threshold causation requirement . . . that it is reasonably probable that the lost economic advantage would have been realized but for [the other party's] interference." *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 852 (9th Cir. 2004); *see also Brody v. Montalbano*, 87 Cal. App. 3d 725, 738 (1978) (third-ranked job applicant passed over for the eighth-ranked applicant "failed to sustain his burden of proof to show that, except for defendants' conduct, there was a reasonable

probability that an economic advantage would have accrued to him").

Neuron Evidence

On May 23, 2023, Rob Rainhart, the current COO of HE360, signed a "non-binding" letter of intent ("LOI") with Neuron. Dkt. No. 119-59. The letter states that Neuron is developing a "global utility" that will allow it to "proliferate a low-cost and rapidly deployable commercial transport layer to route GEOINT [Geospatial intelligence – data gathered from Geostationary Earth Orbit ] directly from satellite sources to users on the ground. Client satellites access the Neuron network through onboard "Neuron Nodes," low SWAP, high-performance optical terminals that beam mission data to other satellites through intersatellite links. . . HawkEye 360 and Neuron have a common interest to provide and distribute low latency, actionable GEOINT from space to the market. Neuron considers HawkEye 360 a potential early adopter of their technology and intends to sell an engineering lab model and at least 3 flight units to HawkEye 360 during the prototyping stage and first production run of their low-SWaP [Size, Weight, and Power] optical terminals at a preferred pricing level. This LOI serves to express HawkEye 360's intent, subject to the terms hereof, to:

A. Explore the ConOps [Concept of Operations of integrating, hosting, and operating a Neuron Node on HawkEye 360 space platforms;

B. Chart a joint engineering effort with Neuron in the demonstration of the Neuron Node, taking place no earlier than 2023; and

C. Utilize Neuron Nodes on planned constellations, if the Neuron hardware and service fits HawkEye 360 requirements."

The letter further states that "unless and until a Definitive Agreement is executed and delivered, neither HawkEye 360 nor Neuron will have any right or obligation under this LOI." *Id.*

In July of 2023, Neuron solicited and obtained HE360's signature on a letter of support to the Department of Defense. This letter stated that HE360 was "interested in hosting Neuron Nodes" and "HawkEye 360 is planning on developing a satellite platform which could serve as a ready platform for … the Neuron Node." Dkt. No. 138-20.



United States District Court
Northern District of California

Neuron stayed in communication with HE360 after the Letter of Support, and continued to provide updates on its product. Dkt. No. 138-16, Ex. O. Neuron exchanged emails with several HE360 employees through March, 2025, in which HE360 expressed interest in "evaluating low SWaP terminals, including non-SDA compatible ones" and particularly in Mr. Husseini's statement that the Neuron Node would be "compatible with Kuiper/Starshield via being a hosted payload on these platforms." *Id.* Christopher Habib of HE360 wrote, "I'm sure the ideal configuration is neuron node <_> neuron node as part of this distributed network, but I'm also curious to see if non-neuron node <_> neuron node could be possible if they were close enough in wavelength." *Id.* Neuron does not point to further business communications after a scheduled call in March, 2025.

<u>Blue Cubed Evidence</u>

Blue Cubed submits testimony from Mr. Rainhart, who signed the Letters of Intent and Support for HE360. Dkt. No. 119-46. He testified that he recalled Neuron as selling an optical terminal that was compatible with a government format called OSIL which was "interesting" to Neuron. *Id.* at 17:13. In 2022, HE360 was interested in optical terminals, but they were not the company's number one priority. They were trying to survey the market and look at the different providers that were out there. HE360's "primary interest" in Neuron's offer at the time was the OSIL standard. *Id.* at 22:4. Mr. Rainhart was looking for terminals that could interface with Space Development Agency assets, and Neuron pitched their product as compatible with SDA interface standards. He was less interested in having optical terminals that spoke to other optical terminals because there were not a lot of other providers with such on-orbit assets that they would be able to talk to. "As time went on, optical became more interesting because there were other providers that were starting to launch services that we could integrate to." *Id.* at 23:9-12. One such provider was Kepler, which provided a relay service in which HE360 would be able to use the terminals to connect to other satellites that would relay the data to the ground for HE360. *Id.* at 24:3-9. Mr. Rainhart did not recall if Neuron was discussed as vendor for the relay use case. *Id.* at 57:17.

In 2022, HE360 was interested in hosting Neuron's hardware terminal on its satellite to interact with SDA terminals and was looking to get government funding to support the test. Id. at 25:10-16. They submitted several ROMs (Rough Orders of Magnitudes), but the Government did not bite. *Id.* at 25:21-25-26:1-15. In January, 2023, Mr. Husseini wrote that Neuron had meetings coming up with the SDA which could lead to a demo/experiment and asked if he could include HE360's name as a potential demo partner. *Id.* at 29:20. Mr. Rainhart said that this was fine. *Id.* at 30:3-5. He testified that his interest was in the SDA and finding avenues to connect with their system. *Id.* at 30:11-16. He testified that there was "no disadvantage" to HE360 to Neuron mentioning the company as a partner to get traction with the SDA. *Id.*

Mr. Rainhart testified that HE360 signed the Letter of Interest to show interest to the SDA in interfacing with their system. *Id.* at 44:5-10. "This is an attempt to get in with SDA and get government funding to put an optical terminal on the HawkEye satellite. I did not want to fund putting an expensive piece of hardware on my satellite when there was no on-orbit asset to relay the data to." *Id.* Mr. Rainhart testified that in 2023, Hawkeye was not in the market to spend its own money optical terminals. It was not a driving force at the time. *Id.* at 55:23-24.

Blue Cubed also presents testimony from the HE360 employee who was responsible for the Blue Cubed-HE360 purchase agreement, Eric Haengel. Dkt. 120-9 (Ex. 62). Mr. Haengel identified and evaluated laser communication terminals for an upcoming planned satellite mission for HE360. *Id.* at 11:4-7. He was VP of space systems and mostly focused on the satellite part of the mission. *Id.* at 11:16-20. Blue Cubed got on list of candidates because he generally knew about them in the industry. *Id.* at 11:24-12:8. HE360 evaluated multiple optical communication terminal vendors and it came down to two choices. *Id.* at 12:9-12. The other option was a company called Tesat in Germany. *Id.* at 12:15. The criteria used to select the vendor were mission requirements and the technical capability of the team backing the product. Id. at 12:20-13:3. Mr. Haengel was impressed by Ryan Kingsbury's [Blue Cubed co-founder] engineering credentials. *Id.* at 13:4-7.

Mr. Haengel was not aware of a potential partnership or sale transaction between Neuron and Hawkeye. *Id.* at 29: 1-5. He thought that if there had been any kind of serious consideration

of purchasing an optical communication terminal to integrate with the spacecraft while he was there, he "almost certain[ly]" would have been part of that conversation. *Id.* at 29:21-30:9.

Blue Cubed also submits evidence that HE360 had a preexisting relationship with Blue Cbed co-founder Dr. Kingsbury. In 2021, HE360 asked Dr. Kingsbury to join a meeting that HE360 had scheduled with the Space Development Industry. Dkt. 116-15. The email exchange mentions HE360's interest in crosslinks between their own satellites and that Dr. Kingsbury showed them Cobalt briefing slides at the time.

<u>Lack of Corporate Testimony from HE360</u>

The only deposition testimony from HE360 comes from Mr. Rainhart and Mr. Haengel, both of whom are no longer full-time HE360 employees. According to Blue Cubed's declaration, Neuron served a deposition subpoena on HE360, met and conferred with HE360, and ultimately decided not to depose the company. Dkt. No. 145-1 at ¶ 7.

<u>Discussion</u>

As an initial matter, Neuron has pointed to evidence showing an economic relationship between itself and HawkEye with a probability of future economic benefit. In May of 2023, the COO of HE360 signed a "non-binding" letter of intent with Neuron that expressed interest in collaborating and potentially using the Neuron Node. HE360 also submitted a Letter of Support for Neuron in connection with a government bid (also non-binding). The companies were in communication about Neuron's product and its potential through at least March of 2025. It is also not in dispute that Blue Cubed was aware of this relationship, since it assisted in preparing slides for the bids for which HawkEye was mentioned.

However, Neuron has failed to produce evidence showing that Blue Cubed's interference with Hawkeye360 *caused* it to lose economic advantage.

Neuron puts forward no evidence that suggests it was in contention for this particular contract. Although it points to HE360's Letter of Intent and Letter of Support, these documents concerned other projects—specifically, attempts to obtain government support for test missions.

Mr. Rainhart, who signed the Letter of Intent for HawkEye, testified that his primary interest was in the potential partnership was compatibility with the Government's OSIL format and potential access to Government funding. He testified that at that time, absent external funding, he had no interest in purchasing from Neuron.

Neuron also points to ongoing communications with Christopher Habib from HE360. In these communications, particularly in 2025, discussion centered on Neuron's compatibility with other mesh networks, including the Kuiper/Amazon network. While these discussions show an ongoing relationship with Neuron and HE360, with the potential of economic benefit, they do not show that Neuron was in contention for the particular contract that Blue Cubed obtained.

Rather, Blue Cubed presents affirmative evidence that Neuron was not considered for the contract.

Eric Haengel, HawkEye's former Vice President of Space & Ground Systems, testified that he worked on identifying and evaluating laser communication terminals for the HE360 satellite mission for which HE360 contracted with Blue Cubed. He testified that if there was any serious conversation about purchasing optical communications terminals at the time, he would almost certainly have been part of it. For this mission, HE360 wanted optical terminals that could communicate between the three HE360 ships in the cluster and consolidate it for relay to earth. HE360 was not looking for terminals that would allow communications with third-parties. He testified that the company evaluated multiple optical communication terminal vendors for this contract and that Neuron was not one of them. In the end, he testified that the decision came down to Blue Cubed and a company called Tesat. Mr. Haengel testified that his criteria for selection were mission requirements and the technical capability of the team backing the product. He testified that Mr. Kingsbury's "impressive" engineering credentials were a factor in his decision. HE360 360 has had a relationship since 2021 with Ryan Kingbury independent of Neuron. He did both paid and pro bono consulting work for the company, on topics including optical space communications.

On this record, Neuron has not met its burden of production to show "that it is reasonably probable that the lost economic advantage would have been realized but for [the other party's]

interference." *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 852 (9th Cir. 2004). First, Neuron has presented no evidence that it was in contention for this opportunity in the first place. Mr. Haengel's testimony suggests that if the opportunity had not gone to Blue Cubed, it would have gone to the second-place company, not Neuron. To the extent that Neuron's argument is that its terminals are identical to Blue Cubed, there is evidence contradicting this. Dkt. No. 116-2 (Dr. Kingsbury testifying about differences between the Cobalt optical terminal and the Neuron Node). But even crediting it as true, Mr. Haengel testified that there were factors in his decision-making other than the technical specifications of the terminals themselves. He specifically called out as a key factor in his decision-making the bona-fides of the technical team supporting the product and emphasized that he was impressed by Mr. Kingbury's technical credentials specifically.

Neuron has failed to show a genuine dispute of material fact that Blue Cubed's actions caused it to lose the Blue Cubed-HE360 contract. And Neuron has not pointed to any other actual disruption of the Neuron-HE360 relationship. Summary judgment is **GRANTED** to Blue Cubed on the tortious interference claim.

**D. Blue Cubed's Counterclaims**

a. <u>Breach of Contract</u>

Neuron moves for summary judgment on Blue Cubed's claims for breach of contract under the Subcontractor Agreement and IP License Agreement, contending that Blue Cubed has put forward no evidence that Neuron has sold or attempted to sell any terminals outside its "Communications-as-a-service" use case. Dkt. No. 115-2. Blue Cubed concedes that, since Neuron has not sold any terminals, it has not sold terminals outside of its use case. Blue Cubed points as its only evidence of breach to Neuron describing its use case more broadly than Blue Cubed finds appropriate in product pitches to potential customers and investors.

"A cause of action for breach of contract does not accrue before the time of breach." *Romano v. Rockwell Internat., Inc.*, 14 Cal. 4th 479, 488 (Cal. 1996). Since Blue Cubed fails to point to any evidence of an actual beach by Neuron, Neuron's motion for summary judgment on the breach of contract claims is **GRANTED**. This grant is without prejudice to Blue Cubed re-

raising the claim if breach materializes.

b. Conversion

Neuron moves for summary judgment on Blue Cubed's conversion claim on the grounds that there is no evidence that Blue Cubed retains title to the terminal launched on the Space Impulse test flight. Dkt. No. 115-2. However, as discussed above in the breach of contract section, the Subcontractor Agreement is at least ambiguous as to whether the prototypes were deliverables, such that title to them vested in Neuron. A jury could reasonably find that Blue Cubed retained title to the prototype unit at issue. Neuron's motion for summary judgment is therefore **DENIED**.

c. Tortious Interference

Neuron moved for summary judgment on Blue Cubed's claim for tortious interference. The parties have since stipulated to dismissal of this claim with prejudice. Dkt. No. 154. The stipulation is **GRANTED**.

United States District Court
Northern District of California

## IV. CONCLUSION

Neuron's summary judgment motion is **GRANTED** in part and **DENIED** in part as to its breach of contract claimed, **GRANTED** as to Blue Cubed's counterclaims for breach of contract, and **DENIED** as to Blue Cubed's claim for conversion.

Blue Cubed's motion for summary judgment is **GRANTED** in part and **DENIED** in part as to Neuron's breach of contract claim, **GRANTED** in part and **DENIED** in part as to Neuron's trade secret claim, and **GRANTED** as to Neuron's tortious interference claim.

As this summary judgment ruling does not dispose of the case, the Court sets a status conference on **8/25/2026** to discuss next steps, including further ADR, in view of this Court's ruling.

**IT IS SO ORDERED**.

Dated: 8/14/2026

EDWARD M. CHEN
United States District Judge