United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEURON SPACE CORPORATION,<br>Plaintiff,<br>v.<br>BLUE CUBED, LLC,<br>Defendant. | Case No. 25-cv-06649-EMC<br><br>**ORDER RE MOTIONS TO CLARIFY AND/OR RECONSIDER**<br><br>Docket No. 170, 175 |

This is a contract and intellectual property dispute between two start-ups in the space optical communications industry, Neuron and Blue Cubed ("BC"). Neuron operates satellite networks, and BC develops optical communications terminals ("OCTs"), which facilitate communication between satellites. The parties sued each other for claims related to breach of two contracts and disclosure of trade secrets. In August 2026, the Court ruled on the parties' cross motions for summary judgment. Dkt. No. 156 ("Order"). At a case management conference in late August, the parties raised inconsistencies and potential errors in the Order, and the Court granted leave for the parties to file motions for clarification or reconsideration. Those motions are now before the Court.

For the reasons explained below, the Court **AMENDS** its prior order. The Court does not alter its holding that BC's license to HE360 did not breach the IP License Agreement, but **CLARIFIES** that this holding depends on HE360's use of the terminals and does not foreclose a future claim of breach if non-speculative evidence comes to light that HE360 intended to (or in fact did) use the terminals for an impermissible purpose. This holding also does not affect the Court's prior grant of Neuron's motion for partial summary judgment that BC breached the notice provision of the IP contract.

## I. BACKGROUND

The facts of this case are recited in the Court's prior order, and the Court does not fully repeat them here. To summarize: In August 2025, Neuron sued BC, alleging that BC breached the IP License Agreement and the Subcontractor Agreement by 1) failing to deliver terminal prototypes; 2) selling the prototype terminals; 3) failing to seek Neuron's permission to make such sales; and 4) failing to notify Neuron of such sales. Neuron also alleged that marketing materials shared by BC as part of its marketing of the Cobalt terminal disclosed Neuron trade secrets, and that BC's sale contract with HE360 constituted tortious interference with a prospective economic partner of Neuron. BC counterclaimed, alleging in relevant part that Neuron exceeded the scope of its license to BC's IP, disclosed BC trade secrets, and interfered with BC's commercialization of its technology. Following motions to dismiss and discovery, Neuron moved for partial summary judgment, and BC moved for summary judgment on all of Neuron's claims.

Only some of the issues in the parties' motions for summary judgment are relevant here. As relevant, BC moved on 1) whether the IP License Agreement permits BC to sell terminals to companies not providing CaaS; and 2) whether Neuron's breach of contract claims are barred by BC's affirmative defenses of waiver and estoppel. Neuron moved on: 1) whether BC breached the IP License Agreement by failing to provide notice to Neuron of its agreement with HE360; 2) whether BC breached the IP License Agreement when it entered into the agreement with HC360; and 3) whether the definition of "Communication-as-a-Service" ("CaaS") is the same in the IP License Agreement and the Subcontractor Agreement.

On August 17, 2026, the Court granted in part and denied in part the cross motions for summary judgment. Dkt. No. 156 ("Order"). Relevant to this motion for clarification, the MSJ order ("Order") held that BC's sale of the terminal to HE360 did not violate the IP License Agreement but denied BC's motion for summary judgment on the question of whether the IP License Agreement permits BC to sell terminals to companies not providing CaaS in general, holding that the question ties into the parties' larger dispute about the meaning of CaaS, which involved disputed issues of fact. *Id.* at 14–20. The Order granted Neuron's motion for summary judgment on the question of whether BC breached the IP License Agreement by failing to provide

United States District Court
Northern District of California

notice to Neuron of its agreement with HE360 but reserved the question of damages for trial. *Id.* at 20–21. Finally, the Order did not address at all BC's asserted affirmative defenses of waiver and estoppel.

In September and October 2026, each party filed a Motion for Clarification or Reconsideration, now before the Court.

## II. LEGAL STANDARD

Reconsideration is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000). Indeed, "a motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Id.* In this district, a party seeking reconsideration must show 1) a material difference in fact or law from that previously presented to the Court; 2) the emergence of new material facts or a change of law; or 3) a "manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court." L.R. 7-9(b). Whether to grant a motion for reconsideration is "committed to the sound discretion of the court." *Navajo Nation v. Confederated Tribes & Bands of the Yakama Indian Nation*, 331 F.3d 1041, 1046 (9th Cir. 2003).

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255. Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need

only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. DISCUSSION

### A. Breach of the IP License Agreement via Sale of Terminals to HE360

In its prior Order, the Court held that BC's sale of the terminal to HE360 did not violate the IP License Agreement. Order at 17. The Court reasoned that, regardless of the scope of Neuron's exclusive license under the Agreement, the sale fell into the Agreement's provision allowing BC to license the terminals "to an additional third-party licensee that is using the optical communication terminals to connect space-borne assets in LEO, wherein the space-borne assets are wholly owned by said third party licensee." *Id.* at 15–17. The Court found that the parties had provided evidence that HE360 intended to use the terminals it purchased from BC to facilitate communication between a cluster of its own satellites. *Id.* at 15–16. For instance, the contract between BC and HE360 states that HE360 "desires to purchase the Products from Seller for use in Purchaser's constellation of satellites." Dkt. No. 116-1. Eric Haengel, who was responsible for the BC-HE360 purchase agreement, testified that HE360 purchased BC's satellites for intersatellite communication in an HE360 mission involving a cluster of three HE360 satellites. Dkt. 120-9 at 5–6.

In its opposition to BC's Motion for Summary Judgment, Neuron had argued that HE360's use of the terminals was a dispute of fact, pointing to statements that HE360 had made to Neuron about its possible interest in someday using optical communication terminals for backhaul. Dkt. No. 138-3 at 23. Neuron also pointed to a statement Scott Palo at BC made to Neuron about a customer who was later revealed to be HE360 who was interested in "low latency backhaul through a space network," Dkt. No. 139-1 at 19–20, and a note from a briefing that HE360 was interested in crosslinking their own terminals in the near term, but "in future," they would be interested to "use it [the terminal] for backhaul." Dkt. No. 139-2 at 1. However, the Court found that the evidence Neuron submitted on this point was insufficient to create a genuine dispute of fact. To the extent HE360 was interested in exploring the potential for a broader network, "this



United States District Court
Northern District of California

interest is not sufficient to raise a genuine dispute of material fact in the absence of evidence that HE360 intends to use the [BC] terminals it purchased for a purpose other than to facilitate communications among its own satellites." Order at 16–17.

Now, Neuron asks the Court to reconsider its holding that there is no genuine dispute of material fact as to HE360's intended use of the BC terminals. Neuron again points to the communications and briefing notes discussed above. In particular, at oral argument, counsel for Neuron noted that in an email between Neuron and HE360 on March 10, 2015, Chris Habib of HE360 said that they were "exploring different types of conops to leverage optical and backhaul" and were speaking with a company called Kuiper about "their relay network." Dkt. No. 138-16 at 4. When asked whether this email exchange supports an inference that HE360 was considering using the terminals purchased from BC for backhaul, Neuron's counsel noted that the email exchange contained a photo of a terminal that appears to be a BC terminal. *See id.* at 5. In a newly produced email exchange between BC and HE360 on March 26, 2025, Chris Habib told BC that he was "still thinking about our previous SDA concept," referring to the Space Development Agency's constellation of satellites. BLUECUBED00038857. Neuron argues that these communications support a reasonable inference in their favor that HE360 was intending to use the terminals it purchased from BC to connect to third-party satellites.

The Court disagrees. Neuron's evidence shows that HE360 was interested in ***someday*** possibly using optical communication terminals to connect to satellites outside of its own network. But any inference that it was going to use the terminals it purchased from BC for that purpose would be "mere speculation," which "cannot raise an issue of fact." *Emeldi v. Univ. of Oregon*, 673 F.3d 1218, 1228 (9th Cir. 2012). To be sure, on summary judgment, the Court must "make all reasonable inferences in favor of" the nonmoving party – in this case, Neuron. *Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, 880 F.3d 1109, 1118 (9th Cir. 2018). But "[a] party opposing summary judgment is entitled to the benefit of only *reasonable* inferences that may be drawn from the evidence put forth," and any finding of a genuine dispute of fact must be "based on more than mere speculation, conjecture, or fantasy." *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680–81 (9th Cir. 1985). Neuron's assertion that statements about what HE360 ***might*** like to do with

optical communication terminals generally, or at some unspecified time in the future, can serve as evidence of what HE360 was planning to do with the terminals it purchased from BC requires an unreasonable inference based on speculation and conjecture. There is no evidence that HE360 took any concrete steps to employ BC's terminal for an impermissible use. Thus, evidence about HE360's general or unspecified future interests is not sufficient to create a genuine dispute of fact as to HE360's actual intended use of the BC terminals. Of course, this ruling is without prejudice to any future claim should HE360 actually employ BC's terminal for an impermissible use. The Court's holding on this point based on the record evidence was not clear error, and Neuron's request for reconsideration is **DENIED**.

BC's sale of the terminals to HE360 was not a breach of the IP License Agreement because the evidence shows that HE360 intended to use the terminals to connect a cluster of its own terminals. Accordingly, the sale was permissible within the provision of the Agreement that allows BC to license the terminals "to an additional third-party licensee that is using the optical communication terminals to connect space-borne assets in LEO, wherein the space-borne assets are wholly owned by said third party licensee."

**B. Possible Breach of IP License Agreement via Future Sales**

Despite granting summary judgment to BC on Neuron's claim of breach as it relates to the sale of terminals to HE360, the Court's prior Order denied BC's motion for summary judgment that the IP License Agreement permits BC to sell terminals to companies not providing "Communications as a Service" ("CaaS"). Order at 20. Now, BC asks the Court to hold that Neuron has no surviving breach claim because the HE360 sale, which was the only sale at issue, was not a breach. Dkt. No. 170 at 4. But as Court stated in its prior order, "the record is clear that Blue Cubed intends to make future [] sales" similar to the HE360 sale. *Id.* The parties do not dispute this statement. Whether the IP License Agreement would allow such sales remains in dispute.

"Contract interpretation, as a question of law, is often amenable to summary judgment, although '[s]ummary judgment may be inappropriate in a contract case if there is a dispute over a

material fact necessary to interpret the contract.'" *Essex Walnut Owner L.P. v. Aspen Specialty Ins. Co.*, 335 F. Supp. 3d 1146, 1150 (N.D. Cal. 2018) (Chen, J.) (quoting *United Pac. Ins. Co. v. Kilroy Indus.*, 608 F. Supp. 847, 850 (C.D. Cal 1985)). In its prior Order, the Court found that there were disputed facts necessary to interpret the license limitation in the IP License Agreement. For instance, while the IP License Agreement granted Neuron an exclusive license "for use in providing Communication-as-a-Service (CaaS) between spacecraft in low Earth Orbit (LEO)," there was a factual dispute about what the parties meant by "Communication-as-a-service." In addition, as discussed above, regardless of the scope of Neuron's exclusive license, the contract allows BC to license its IP "to ***an*** additional third-party licensee that is using the optical communication terminals to connect space-borne assets in LEO, wherein the space-borne assets are wholly owned by said third party licensee." The parties dispute whether this provides BC with the ability to license to only *one* such third party or to *multiple* third parties.

The IP License Agreement defines CaaS as: "a space-borne entity in LEO providing access to any other space-borne entity in LEO for the purpose of transporting data originating from an asset(s) in space that is owned or operated by any third party." The parties agree that "space-born entity" and "asset(s) in space" refer to satellites or terminals on satellites, and the reference to "third party" means "not Neuron or Blue Cubed." *See* Ex. 7 (5/8/26 Bellusci Tr.) at 111:1-114:18; Ex. 8 (5/19/26 Husseini Tr.) at 83:4-85:2, 94:17-25. The parties dispute whether CaaS includes *only* selling a data service – charging customers to send data between satellites – or whether it also includes selling hardware that a customer could then use to send data itself. BC introduces evidence that Neuron described its business model of CaaS as providing a terminal at very low cost or free, and then charging per use. *See* Dkt. No. 134-1 at 8. This would indicate that CaaS encompasses only the *use* of a terminal, not the *ownership* of terminals. However, as Neuron points out, the use and ownership of a terminal are difficult to separate. Neuron contends that to provide its service, it must provide its own hardware, and BC, by selling a competing optical terminal that does not provide Neuron's service, interferes with Neuron's ability to establish its service. In essence, customers like HE360 who buy the terminal from BC would be able to send data between satellites themselves and would have no need for Neuron's data service.



United States District Court
Northern District of California

As the prior Order holds, there is a factual dispute underpinning the competing interpretations of the scope of CaaS, and thus this remains for trial. Nonetheless, in an effort to provide the parties clarification on exactly what remains for trial, the Court addresses the issue of whether the IP License Agreement permits BC to license to more than one party.

The Court holds that, if the scope of CaaS is determined to include *only* the provision of a communications service, and not the use of hardware by the owner of that hardware (giving full effect to the "as a service" part of the term), then future sales of the hardware to third parties who plan to use it only within their own satellites would be permissible. In that instance, the provision in the IP License Agreement allowing licensing "to an additional third-party licensee that is using the optical communication terminals to connect space-borne assets in LEO, wherein the space-borne assets are wholly owned by said third party licensee" is superfluous and must be read as a clarification of the use cases that are not within the scope of Neuron's exclusive license.[1] Use by a third party to connect satellites that are wholly owned by that third party would necessarily *not* be included in the definition of CaaS, if CaaS is so narrowly construed. Accordingly, there would be no reason to limit the number of third parties who could use the terminals in this way, as they would not be infringing on Neuron's use case.

On the other hand, if the scope of CaaS includes *all* communications between satellites in LEO including those instances where the hardware is owned by the party sending the communication, the provision in the IP License Agreement allowing licensing "to ***an*** additional third-party licensee that is using the optical communication terminals to connect space-borne assets in LEO, wherein the space-borne assets are wholly owned by said third party licensee" is an exception allowing licensing to only a *single* (not multiple) third-party licensee. It does so for the following reasons:

- The plain language of contract is singular
- Multiple licenses would infringe on Neuron's use case, so it makes sense for it to be a

---

[1] Such superfluidity might be an argument against such a construction of CaaS. However, it would not likely be dispositive as clauses which are superfluous can sometimes be explained as a "belt and suspenders" clarification, especially where there are other provisions in the document which could be characterized as superfluous.

narrow exception – otherwise, what is the point of granting Neuron an exclusive license within that use case?

- Limiting permissible sales to one party also comports with the other carve-out in the IP License agreement: "This Licensing Agreement does not prohibit Blue Cubed, LLC from licensing the use of the Blue Cubed IP to any third-party licensee that does not compete with Neuron in the CaaS market such as for Position, Navigation and Timing." Under a broad reading of CaaS, both of these would be exceptions to the exclusive license. The parties used "any" for the exception related to parties *not* competing with Neuron. To give effect to "an" in contrast with "any," the "wholly-owned" exception should be read to allow a license to only one third party. Otherwise, this carve-out would be superfluous.

### C. Blue Cubed's Affirmative Defenses

In its Motion for Summary Judgment, BC argued that Neuron's breach of contract claims were barred by BC's affirmative defenses of waiver and estoppel. (Dkt. No. 120-3 at 23–25.) However, the Order did not address these affirmative defenses at all. BC asks the Court to clarify whether it intends to rule on BC's affirmative defenses.

BC's waiver and estoppel arguments boil down to the idea that Neuron was aware that BC was marketing the terminal for sale since at least March 2024 and took no action to enforce the IP License Agreement or Subcontractor Agreement, effectively waiving its breach claims and leading BC to believe that Neuron did not take issue with its conduct. There are disputed issues of fact about what Neuron knew about BC's marketing activities and whether BC was hiding relevant activity from Neuron. For example, BC says that they openly marketed the terminal at conferences and communicated with Neuron about potential sales. *See, e.g.*, Dkt. No 121-38 (July 2024 email from BC to Neuron describing BC's "recent efforts to sell Cobalt terminals" and engagement with "a second customer who is potentially interested in the option for a communication as a service opportunity."). Neuron says that even if they knew BC was planning to sell the terminals, they did not know that BC was planning to sell the terminals in a way that



United States District Court
Northern District of California

would infringe on Neuron's exclusive license. *See, e.g.*, Dkt. No. 138-12, Husseini Dep. Tr. at 20–21 (Mr. Husseini testifying that Neuron did not know that BC had a deal with HE360 until this litigation began, and that while Neuron was aware that BC was marketing to satellite operators before this litigation began, Mr. Husseini thought that they were only marketing to operators within BC's field of use, not within Neuron's field of use). Due to such disputes of fact, the Court **DENIED** BC's motion for summary judgment as to its affirmative defenses of waiver and estoppel. Those defenses remain for trial.

**D. Neuron's Requests to Strike**

Neuron asks the Court to strike three paragraphs in the Order. First, Neuron asks the Court to strike a paragraph on page 14 of the Order beginning "As a threshold matter" (lines 15–27). That paragraph holds that BC's sale of the terminal to HE360 did not breach any licensing provision of the Subcontractor Agreement because the Subcontractor Agreement did not provide Neuron with an exclusive license. However, as Neuron points out, the paragraph could be construed to hold that the sale did not breach *any part* of the Subcontractor Agreement, which would not be accurate. For instance, elsewhere in the Order, the Court explicitly reserved for trial the question of whether the sale breached the "prior written approval" requirement of the Subcontractor Agreement. Neuron also notes that the paragraph inaccurately describes Neuron's brief in opposition to BC's motion for summary judgment as a "motion." The Court **AMENDS** that paragraph as follows.

> As a threshold matter, to the extent that Neuron has put at issue whether the sale of terminals breached Blue Cubed's obligations under the *Subcontractor Agreement*, Neuron's ~~motion is denied~~ **argument is foreclosed**. *See* Dkt. No. 138-3 at 17-18 (Neuron arguing that even if Blue Cubed could sell terminals under the IP License Agreement, that does not mean Blue Cubed could sell terminals under the Subcontractor Agreement); Dkt. No. 144-3 at 10. The Subcontractor Agreement nowhere provides Neuron with an exclusive license to any of the IP within the agreement. Rather, as discussed below, Neuron is assigned IP relating to the optics/gimbal interface, in which Blue Cubed is granted a cross-license—a license that is not limited by any particular use case (unlike the Neuron license, which is limited to "communications as a service" use case). The Subcontractor Agreement's only use case limitation is on Neuron. *See* Dkt. No. 4-4 at 9.4 Use Case Restrictions; 11.5 Software



United States District Court
Northern District of California

> Use Case Restrictions (limiting Neuron's assignment/license to use within the Communications-as-a-service in LEO field of use). No such restriction applied to Blue Cubed, so its sale of its terminal to HE360 did not breach **any IP licensing restrictions in** the Subcontractor Agreement. **The Court does not address in this paragraph whether the sale to HE360 breached any other provision of the Subcontractor Agreement.**

Second, Neuron asks the Court to strike a passage on page 17 of the Order that begins with "Further, even if HE360 did use the terminals for download and backhaul" and ends with "within its use case" (lines 3–9). Neuron says that the passage errs in conflating "downlink" and "backhaul," which the order and record distinguish. This distinction matters because "backhaul" refers to connections between satellites in space where data is beamed satellite-to-satellite for immediate routing to a ground station. Thus, "backhaul" – the intersatellite connections *before* a downlink – is arguably within the definition of CaaS, and the Order's statement that it "appears to fall outside of Neuron's exclusive license" would appear to prejudge an issue the Order left for trial (the scope of the exclusive license). To clarify that the Court was only referring to downlink that is indisputably outside of the scope of CaaS, the Court **AMENDS** that passage as follows.

> Further, even if HE360 did use the terminals for downlink and ~~backhaul~~ **space-to-ground transmissions**, such uses appear to fall outside of Neuron's exclusive license, which only covers LEO communications (between satellites in LEO), not downlinks to Earth. Mr. Husseini testified that the license to Neuron leaves Blue Cubed free to engage in downlink services, if it wishes. *See* Dkt. No. 138-12 at 82:21-83:3 (Blue Cubed free to operate in "LEO to air, LEO to ground, LEO to sea, LEO to MEO, LEO to GEO"). And Neuron's counsel clarified at oral argument that Neuron does not contend that LEO to ground ~~backhaul~~ **transmission** is within its use case.

Third, Neuron asks the Court to strike a passage on page 18 of the Order that begins with "Mr. Husseini initially proposed" and ends with "communications field that it was licensing" (lines 12–26). Neuron argues that the passage inaccurately conflates the terms "unit," "box," and "terminal." The passage cites the record for statements contemplating BC's sale of "units" and a "box" that were made in 2020 and 2021, respectively. Both parties agree that the paragraph is unnecessary to the Order's holding. Its primary purpose is to demonstrate that there are material factual disputes that bear on whether the parties intended the IP License Agreement to restrict

/

/

United States District Court
Northern District of California

United States District Court
Northern District of California

BC's sales of the terminal. There is a genuine dispute as to whether the parties used the terms "unit" and "box" were interchangeably with "terminal." Thus, the Court **STRIKES** the passage.

**IT IS SO ORDERED**.

Dated: November 16, 2026

EDWARD M. CHEN
United States District Judge